T.C. Memo. 2003-309


UNITED STATES TAX COURT


ESTATE OF EUGENE E. STONE, III, DECEASED, C. RIVERS STONE, E.E.
STONE, IV, MARY STONE FRASER & ROSALIE STONE MORRIS, CO-PERSONAL
REPRESENTATIVES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF ALLENE W. STONE, DECEASED, C. RIVERS STONE, INDEPENDENT
EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13647-01, 14195-01.      Filed November 7, 2003.


<u>John W. Porter</u>, <u>Stephanie Loomis-Price</u>, and <u>Robert E.
August</u>, for petitioners.

<u>J. Craig Young</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined deficiencies in

Federal estate tax (estate tax) with respect to the Estate of

Eugene Earle Stone, III (Mr. Stone's estate), and the Estate of
Allene W. Stone (Ms. Stone's estate) in the amounts of $3,268,401
and $741,809, respectively.  The only issue remaining for deci-
sion in the case of Mr. Stone's estate is whether certain assets
owned by each of five family limited partnerships (Five Partner-
ships) are includible in his gross estate under section
2036(a)(1).[1]  We hold that none of the assets owned by any of
the Five Partnerships is includible in Mr. Stone's gross estate
under section 2036(a)(1).  There are two issues remaining for
decision in the case of Ms. Stone's estate.  The first issue is
whether certain assets owned by each of the Five Partnerships are
includible in her gross estate under section 2036(a)(1).  We hold
that none of the assets owned by any of the Five Partnerships is
includible in Ms. Stone's gross estate under section 2036(a)(1).
The second issue is whether certain assets owned by one of the
Five Partnerships is includible in Ms. Stone's gross estate under
section 2044.  We hold that none of the assets owned by that
partnership is includible in Ms. Stone's gross estate under
section 2044.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect on the respective dates of
the deaths of Eugene Earle Stone, III (Mr. Stone), and Allene W.
Stone (Ms. Stone).  All Rule references are to the Tax Court
Rules of Practice and Procedure.

except as discussed below.

Mr. Stone was a resident of South Carolina at the time of his death on June 5, 1997. Ms. Stone was a resident of South Carolina at the time of her death on October 16, 1998.

Mr. and Ms. Stone had four children (children): Eugene Earle Stone, IV, C. Rivers Stone, Rosalie Stone Morris (Ms. Morris), and Mary Stone Fraser (Ms. Fraser). At the time the respective petitions in these consolidated cases were filed, Eugene Earle Stone, IV, C. Rivers Stone, and Ms. Fraser resided in South Carolina, and Ms. Morris resided in Georgia.

In 1933, Mr. and Ms. Stone founded several successful ventures in the apparel industry. Thereafter, at a time before 1976 not disclosed by the record, those ventures became Stone Manufacturing Co. (Stone Manufacturing), a global manufacturer and distributor of apparel, located in Greenville, South Carolina. At least as early as the 1980s, Stone Manufacturing focused on sports apparel and in particular soccer apparel.

In 1939, Mr. Stone purchased approximately 60 acres of real property known as Cherrydale (Cherrydale property), located in Greenville County, South Carolina, for the purpose of relocating the manufacturing facilities of Mr. and Ms. Stone's apparel-industry business to that property. Shortly after purchasing the Cherrydale property, Mr. and Ms. Stone began to use it, except for the Cherrydale residence discussed below, as the location for

the operations of that business.[2]

Around 1950, after having made the repairs necessary to make it habitable, Mr. and Ms. Stone along with their children (collectively, the Stone family) began residing in the house situated on the Cherrydale property, which had been built in the 1840s. (We shall refer to the house and the approximately four acres of surrounding land on the Cherrydale property where the Stone family began residing around 1950 as the Cherrydale residence.)

From at least as early as 1994 until their respective deaths, Mr. Stone lived in North Carolina on a 582.672-acre parcel of land located on certain real property known as Cedar Mountain (Cedar Mountain property),[3] and Ms. Stone lived in a villa in The Cypress of Hilton Head (Cypress villa) on Hilton Head Island, South Carolina.

By the late 1980s or the early 1990s, the Cherrydale residence had begun to deteriorate, although the Cherrydale property was still being used as the location for Stone Manufacturing's

---

[2]Although not altogether clear from the record, it appears that at some time after Mr. Stone purchased the Cherrydale property he transferred that property, except for the Cherrydale residence discussed below, to Stone Manufacturing.

[3]Mr. and Ms. Stone's Cedar Mountain property, located in Little River Township, N.C., north of Greenville, S.C., consisted at least as early as 1994 of a 582.672-acre parcel, a 1054.415-acre parcel, and a .338-acre parcel, which they accumulated over approximately a 50-year period. During that time, Mr. and Ms. Stone carried out their vision of developing the Cedar Mountain property by, inter alia, building various lakes and bridges and at least one residence on that property.

operations.  Because those operations were in such close proxim-
ity to the Cherrydale residence, Mr. Stone and Stone Manufactur-
ing decided that that residence could serve as a place to house
out-of-town business visitors to its facilities.  To that end, in
late summer 1995, renovation work commenced on the Cherrydale
residence and was completed in the fall of 1997.  During that
renovation, the Cherrydale residence was uninhabitable.

In 1976, Mr. Stone formed Stones, Inc., as a holding company
of Stone Manufacturing and owned 100 percent of the common stock
of that holding company.  (For convenience, we shall sometimes
refer to Stones, Inc., and Stone Manufacturing, separately and
collectively, as the Company.)  From 1976 until April 1997, Mr.
Stone owned a preferred stock interest in Stones, Inc.

On December 30, 1976, Mr. Stone made a gift of 2,250 shares,
or 50 percent, of the common stock of Stones, Inc., to each of
two trusts (collectively, the trusts) that he established, one
for the benefit of his children and one for the benefit of his
grandchildren.  At the time the trusts were formed, Stones, Inc.,
owned 83.4 percent of the common stock of Stone Manufacturing.
At that time, C. Rivers Stone, who became president of Stone
Manufacturing shortly before Mr. Stone established the trusts,[4]

---

[4]C. Rivers Stone, who as a teenager began working for Stone
Manufacturing during the summers, remained president of Stone
Manufacturing until around 1999 when he stopped working for the
Company.

and John J. Brausch (Mr. Brausch), a senior executive officer of Stone Manufacturing, were trustees of the trusts.

At least as early as April 28, 1992, Stones, Inc., owned 83.4 percent, each of the children owned 4.1 percent, and Ms. Stone owned the remaining .2 percent of the common stock of Stone Manufacturing. At least as early as that date, Eugene Earle Stone, IV, who became a vice president of Stone Manufacturing in 1978 and became its chief executive officer in 1982,[5] C. Rivers Stone, and Mr. Brausch, all of whom were also officers and directors of Stones, Inc., were trustees of the trusts.

At all relevant times, Ms. Morris and her husband, Charles H. Morris (Mr. Morris), were involved in the newspaper business in Savannah, Georgia. Ms. Fraser and her husband, Charles Fraser (Mr. Fraser), were, along with C. Rivers Stone, involved in the development of Sea Pines Plantation located on Hilton Head Island, South Carolina. At no relevant time were Ms. Morris and Ms. Fraser involved in the day-to-day affairs of the Company.

At least as early as around the late 1980s, Mr. Stone and Ms. Stone were serving as directors of the Company, but they were no longer involved in the day-to-day affairs of its business. At least as early as the last six months of 1995, Mr. Stone and Ms. Stone were in control of their respective assets, but they no

---

[5]Eugene Earle Stone, IV, remained chief executive officer of Stone Manufacturing at all relevant times.

longer were interested or actively involved in managing those assets and wanted their children to become actively involved in the management of those assets.

During the 1980s, Stone Manufacturing, which employed about 4,000 people, acquired from Umbro, an internationally known manufacturer and distributor of soccer apparel, the right to distribute Umbro's products within the United States. In late 1991, Stone Manufacturing began discussions regarding the possibility of acquiring from Umbro the right to distribute Umbro's products internationally. On April 28, 1992, Stone Manufacturing and the owners of Umbro signed a purchase agreement under which Stone Manufacturing agreed to acquire the right to distribute Umbro's products internationally.

On April 28, 1992, Ms. Morris, Ms. Fraser, and their respective children filed a petition (petition) in a Probate Court in South Carolina (Probate Court) against Eugene Earle Stone, IV, C. Rivers Stone, and Mr. Brausch, as trustees of the trusts, and against the children of C. Rivers Stone, as beneficiaries of one of the trusts. (We shall refer to that litigation as the litigation among the children and to all the parties in that litigation as the parties in the litigation among the children.) Eugene Earle Stone, IV, discussed the litigation among the children with his parents, but neither Ms. Stone nor Mr. Stone was or became a party in that litigation.

The petition in the litigation among the children included claims against the trustees for an accounting, breach of trust, breach of fiduciary duties, abuse of discretion, negligence, and self-dealing and sought the removal of Eugene Earle Stone, IV, C. Rivers Stone, and Mr. Brausch as trustees of the trusts.  The petition alleged in part as follows:

> 1.   Petitioners are beneficiaries of a certain Agreement and Declaration of Trust, dated December 30, 1976 and entered by and between Respondents, E.E. Stone, IV, C. Rivers Stone, and John J. Brausch, as Trustees, (Hereinafter "Trustees") for two Trusts established and funded by Eugene E. Stone, III. * * *.

> *       *       *       *       *       *       *

> 9.   As Trustees of the two Trusts, Respondents, Trustees, control 100% of the shares of Stones, Inc.

> *       *       *       *       *       *       *

> 11.   In their positions as Trustees, Respondents control, and have controlled since the inception of the Trusts on December 30, 1976, and for a period of sixteen (16) years, the election and appointment [sic] officers and directors of Stone Manufacturing Company, Inc., by virtue of their control of all of the stock of Stones, Inc. and, by reason thereof, 83.4% of shares of stock of Stones [sic] Manufacturing Company, Inc.

> *       *       *       *       *       *       *

> 16.   Respondents', Trustees', control of the companies has allowed them to appoint themselves as directors and officers of Stone Manufacturing Company, Inc.

> 17.   E.E. STONE, IV, C. RIVERS STONE and JOHN BRAUSCH are the officers and directors for Stones, Inc.

> *       *       *       *       *       *       *

> 21.   Respondent Trustees, for sixteen (16) years

have failed to manage the Trusts' assets in a fashion designed to generate income for the Trusts in an amount sufficient to enable the Trustees to distribute directly to all adult beneficiaries (and to the parent/guardians of beneficiaries who are minors) income in an amount sufficient to meet the "standard" as set forth in Article II and Article III as the 1976 Declaration of Trust to each and every beneficiary each year, such "standard" being stated in such 1976 Trust as follows:

(1) "reasonable health care"

(2) "support in his or her accustomed manner of living"

(3) "maintenance"

Since 1976, the Trustees have produced no income whatsoever to the Trusts from Trust investments and have made no distributions to the beneficiaries to meet the "standard" for such annual distributions as quoted above.

\*        \*        \*        \*        \*        \*        \*

26.  Notwithstanding the substantial net earnings of Stone Manufacturing Company, Inc., \* \* \* the Directors have neglected, failed and refused to ever declare a dividend for distribution of profits to shareholders.

\*        \*        \*        \*        \*        \*        \*

28.  While Respondents, E.E. STONE, IV and C. RIVERS STONE, as officers and directors of Stone Manufacturing Company, Inc., have taken and received substantial income and benefits for themselves, from Stone Manufacturing Company, Inc., they have, in their positions as Trustees, withheld and denied any similar income and benefits to the shareholders of the company and the beneficiaries of the Trusts.

On April 28, 1992, Ms. Morris, Ms. Fraser, and their respective children filed a motion in the Probate Court for immediate restraining orders precluding Eugene Earle Stone, IV, C. Rivers

Stone, and Mr. Brausch from taking certain actions as trustees of the trusts. On April 28, 1992, the Probate Court granted that motion.

Around May 7, 1992, Stone Manufacturing filed a motion to intervene in the litigation among the children. By order dated June 18, 1992, the Probate Court made Stone Manufacturing a party in that litigation.

On a date not disclosed by the record between April 28 and July 22, 1992, Stones, Inc., became a party in the litigation among the children.

On July 22, 1992, Ms. Morris, Ms. Fraser, and their respective children filed in the Probate Court what was identified as an amended complaint (amended complaint). The amended complaint sought, inter alia, to enjoin Eugene Earle Stone, IV, C. Rivers Stone, and Mr. Brausch, as trustees of the trusts, from, inter alia, purchasing from Umbro the right to distribute Umbro's products internationally. As grounds for granting such an injunction, the amended complaint alleged that any such purchase would necessitate the incurrence of considerable debt by Stone Manufacturing and delay the payment to the trusts of any dividends from the Company.

On September 13, 1993, C. Rivers Stone filed a petition in the Probate Court (C. Rivers Stone's petition). C. Rivers Stone's petition alleged in part as follows:

Your petitioner, C. Rivers Stone, would respectfully show unto the court:

1. That he is a Respondent in the * * * action which is pending before this Court.

\* \* \* \* \* \* \*

5. That E.E. Stone, IV, is a Director and Chief Executive officer of Stone Manufacturing Company.

\* \* \* \* \* \* \*

7. That E.E. Stone, IV, has never been properly named or elected as a director of Stones, Inc.

8. That on Friday, September 10, 1993, E.E. Stone, IV called a meeting of Stones, Inc., and proposed that the Board of Stone Manufacturing Company be reduced from five directors to three directors and that E.E. Stone, IV vote the stock on behalf of Stones, Inc.

9. That proper notice was not given to the directors of this proposed change of the Directors and for E.E. Stone, IV to vote the stocks of Stones, Inc. as required by law and by the Company's by-laws.

10. That the Petitioner, C. Rivers Stone, is a Director and President of Stones, Inc., and as president has always voted the stock of Stone Manufacturing Company.

\* \* \* \* \* \* \*

16. That the Petitioner is informed and believes that E.E. Stone, IV is not a properly elected Trustee of the children's trust or the grandchildren's trust.

\* \* \* \* \* \* \*

19. That the moves undertaken by E.E. Stone, IV with the cooperation of John J. Brausch * * * are to take total and complete control of the Trustees and thereby totally control and dominate the family corporations.

\* \* \* \* \* \* \*

22. That the Petitioner believes that he will be removed as President and Director of Stone Manufacturing with great loss in salary and will cause him irreparable harm.

\* \* \* \* \* \* \*

WHEREFORE, having fully petitioned the Court, the Petitioner, C. Rivers Stone, prays that the Court issue its Order restraining E.E. Stone, IV, John J. Brausch, Stone Manufacturing Company and Stones, Inc. from:

1. Withdrawing or reducing the compensation of the Petitioner, C. Rivers Stone \* \* \*

2. Removing the Petitioner, C. Rivers Stone, as President of Stone Manufacturing Company and Stones, Inc.;

3. Removing the Petitioner, C. Rivers Stone, as a Director of Stone Manufacturing Company and Stones, Inc.; and

4. Allowing E.E. Stone, IV from voting the stock on behalf of Stones, Inc.

On September 13, 1993, C. Rivers Stone filed a motion (C. Rivers Stone's motion) in the Probate Court seeking an immediate restraining order, as requested in C. Rivers Stone's petition, against Eugene Earle Stone, IV, Mr. Brausch, Stone Manufacturing, and Stones, Inc. On September 13, 1993, the Probate Court granted C. Rivers Stone's motion.

The parties in the litigation among the children attempted to minimize any publicity about that litigation. However, that litigation was hotly contested and became very bitter.[6] As a

---

[6]The litigation among the children was so contentious that even Ms. Morris and Ms. Fraser, who, along with their respective
(continued...)

result, the local business community, including the customers and the suppliers of the Company and the financial institutions that dealt with it, as well as the Company's employees, became aware of that litigation and concerned about its impact on them. The litigation among the children resulted in total legal fees for the parties in that litigation of between $2 million and $3 million.

Throughout the course of the litigation among the children, the children had certain concerns regarding Mr. Stone's assets and Ms. Stone's assets (the children's concerns regarding Mr. Stone's and Ms. Stone's assets), which presented potential grounds for additional litigation among the children. The children's concerns regarding Mr. Stone's and Ms. Stone's assets included concerns relating to (1) the management of those assets (a) during their parents' lives, which became a very serious concern at least as early as the last six months of 1995 when their parents no longer were interested or actively involved in managing such assets, and (b) after their parents died; (2) certain charitable gifts that Mr. Stone had made, including a gift to Furman University in December 1994 for the design and

---

[6](...continued)
children, had filed the petition instituting that litigation, disagreed on certain matters, as is evidenced by the fact that at a time not disclosed by the record Ms. Morris, but not Ms. Fraser, sought to settle that litigation as it pertained to Ms. Morris and her children.

construction of a permanent soccer facility to be named the Eugene E. Stone, III, Soccer Stadium; (3) Ms. Stone's living arrangements; and (4) the use of Ms. Stone's credit cards.

With respect to the children's concerns relating to the management during their parents' lives and thereafter of their parents' respective assets, Eugene Earle Stone, IV, had a particular interest in managing, and maintaining the value of, the preferred stock of Stones, Inc.  C. Rivers Stone was very interested and involved in real estate development[7] and had a particular interest in managing Mr. Stone's real property known as Piney Mountain (Piney Mountain property).[8]  Ms. Morris, who had substantial expertise in business and financial matters, had a particular interest in managing certain of her parents' stocks and securities, including at least some of Mr. Stone's preferred stock in Stones, Inc.  Ms. Fraser, who had developed a deep attachment to her parents' Cedar Mountain property, had a partic-

--------

[7]C. Rivers Stone pursued on a fulltime basis his strong interest in real estate development after he stopped serving as president of Stone Manufacturing around 1999.  C. Rivers Stone's first exposure to real estate development was at the age of 13 when he helped his father build two 50-acre lakes on the Cedar Mountain property.  At the time of the trial in the instant cases, C. Rivers Stone had been involved in five major real estate development projects.

[8]Mr. Stone's Piney Mountain property, located in Greenville, S.C., consisted at least as early as 1994 of approximately 370 acres, which he accumulated over approximately 20 to 30 years.  During that time, Mr. and Ms. Stone maintained a vision as to how the Piney Mountain property should be developed.  C. Rivers Stone shared that vision.

ular interest in managing that property and envisioned that it would be used some day as a site for religious activities.[9]  All of the children had a particular interest in the Cherrydale residence, which had been the site of their home starting around 1950 and thereafter while they were living with their parents and which Mr. Stone and the Company decided could serve as a place to house out-of-town business visitors to Stone Manufacturing's operating facilities located on the Cherrydale property.

Mr. Stone and Ms. Stone found their children's desires to become actively involved during their parents' lives in managing certain assets that their parents owned to be consistent with their own wishes.  That is because, as discussed above, at least as early as the last six months of 1995 Mr. Stone and Ms. Stone, although in control of their respective assets, no longer were interested or actively involved in managing those assets.  As a result, the prospect of having their children become actively involved in the management of their respective assets was very appealing to Mr. Stone and Ms. Stone.  To that end, Mr. Stone and Ms. Stone encouraged their children to attempt to come to an agreement among themselves as to the particular assets that each child wanted to become actively involved in managing.  Mr. and Ms. Stone believed that any such agreement, if one could be

---

[9]When Ms. Fraser was a child, she spent a lot of time at, and developed a strong connection to, the Cedar Mountain property.

reached, would be of assistance to them in deciding which of their respective assets they wanted each of their children to become actively involved in managing.

The parties in the litigation among the children engaged in extensive discussions to settle that litigation and to resolve the children's concerns regarding Mr. Stone's and Ms. Stone's assets so as to avoid any future litigation as to such concerns. Those parties intended and agreed that any agreements that they were able to reach were to be comprehensive and to cover every possible issue that might arise among them as to those matters. On June 3, 1994, the parties in the litigation among the children and their respective attorneys executed a plan (1994 plan for settlement) to settle that litigation and to resolve the various issues relating to the children's concerns regarding Mr. Stone's and Ms. Stone's assets. Ms. Stone and Mr. Stone were not parties to the 1994 plan for settlement, and neither of them signed that document.

With respect to the issues relating to the trusts, the 1994 plan for settlement provided in part as follows:

I.  TRUSTS
    The existing trusts will remain as two (2) trusts administered by three (3) independent, qualified Trustees.

    A.  THREE TRUSTEES TO ADMINISTER EXISTING TRUSTS
        There will be three independent, qualified Trustees ("Trustees") who shall administer the two existing trusts ("Existing Trusts") in accordance with the terms of the

1976 Trust Agreement, as clarified by this Plan for Settlement. The term "independent" for purposes of the two existing trusts (Children's and Grandchildren's trust) shall mean a person who:

(1) is not related by blood or marriage to any child, grandchild or spouse;

(2) is not and has not been employed by such child, grandchild or spouse, or any company which has employed such child, grandchild or spouse;

(3) is not now and has not been engaged in any common business effort with such child, grandchild or spouse;

(4) has not acted as attorney or accountant for such child, grandchild or spouse or any company which has employed such child, grandchild or spouse; and,

(5) agrees never to do business with or purchase stock in the Company.

(6) has sole allegiance to the management of the Trust in accordance with the written provision of the Trust Agreement, as clarified by this Plan for Settlement, and to the impartial protection of the interest of the beneficiaries.

The term "qualified" shall mean a person who has been active in a senior management role in a for-profit business within the last three (3) years.

Any action taken by the Trustees of the Existing Trusts shall require majority vote and contemporaneous minutes of such action shall be circulated to the adult beneficiaries.

*     *     *     *     *     *     *

B.  SELECTION OF TRUSTEES
Each child shall anonymously nominate one independent, qualified trustee candidate. The Probate Court shall select the three Trustees from the four nominated. * * *

*     *     *     *     *     *     *

H.   RESIGNATION AS TRUSTEES
E.E. Stone, IV, C. Rivers Stone, and John Brausch will resign as trustees to facilitate the implementation of this Article I, effective with the selection of and acceptance by the Trustees of the Existing Trusts.

With respect to the issues relating to the children's concerns regarding Mr. Stone's and Ms. Stone's assets, the 1994 plan for settlement provided in part as follows:

VI.   ESTATE ISSUES

The four children and John Brausch shall cooperate in an attempt to have E.E. Stone, III, and Allene W. Stone make the following changes in their respective estate plans:

A.   PREFERRED STOCK
E.E. Stone, III, would convey or assign directly or indirectly equally to each of the four children, the right to one-fourth (1/4) of the dividends from * * * [his] preferred stock for a period of fifteen (15) years (which time period is set forth herein to allow a proper valuation) and make an immediate donation of his preferred stock to the Stone Foundation, such assignment(s) to be effectuated in a tax efficient manner.  There would be no further charitable donation under his will.  The Company [defined in the 1994 plan for settlement as Umbro International, Inc., the name of the company resulting from a proposed merger of Stones, Inc., and Stone Manufacturing] shall be entitled to call the preferred stock any time.

B.   TESTAMENTARY TRUSTS
There would be no trusts for descendants under E.E. Stone, III or Allene W. Stone's wills.  After E.E. Stone, III's death, the portion of his estate not going to Allene W. Stone, after payment of estate taxes, will be distributed equally and directly to each of the four children or that Child's designated beneficiaries.  After Allene W. Stone's

death, the remaining E.E. Stone, III/Allene W. Stone estate after estate taxes would be distributed equally to the four children or that Child's designated beneficiaries.

C.     FAMILY SETTLEMENT AGREEMENT

The Children and Grandchildren (or their guardians ad litem) and the Stone Foundation (if necessary) shall execute a Family Settlement Agreement (pursuant to S.C. Code § 62-3-1101 et seq.) which provides for a division inter se [sic], in the manner set forth in * * * [other parts of this agreement] in the event E.E. Stone, III, or Allene W. Stone fail to change or maintain their Wills in the same manner.

\*       \*       \*       \*       \*       \*       \*

F.     POWERS OF ATTORNEY

All existing powers of attorney for E.E. Stone, III and Allene W. Stone will be revoked and new, limited, permanent powers of attorney executed that have been pre-approved by all four children to provide management of parents' monthly cash needs, management of the maintenance of houses, cars, health care, etc., of both parents. All accounts relative to the parents will be audited by the Trustees' accounting firm.

\*       \*       \*       \*       \*       \*       \*

H.     ARBITRATION

The Children shall use their best efforts to agree on the allocation of the property of the estate of E.E. Stone, III and Allene W. Stone.

It is agreed that Rivers Stone shall receive Piney Mountain from the estate of E.E. Stone, III and Allene W. Stone provided, however, Rivers Stone shall not be entitled to receive more than one-fourth of the total value of the net estates after estate taxes.

It is further agreed that Mary Fraser shall receive one-half (½) of the Cedar Mountain property from the estate of E.E. Stone, III

and Allene W. Stone; Rosalie Morris and E.E. Stone, IV shall each receive one-fourth (¼) of Cedar Mountain.  Notwithstanding the fore-going, neither Mary Fraser, Jack Stone [Eu-gene Earle Stone, IV], nor Rosalie Morris shall be entitled to receive more than one-fourth (¼) of the total value of the net estates after estate taxes.  The parties will use their best efforts to agree on the dimen-sions and appurtenances to the same prior to the final Court approval of the settlement.

    *        *        *        *        *        *        *

Any disagreement over the provisions in this Section VI shall be submitted to binding arbitration before the American Arbitration Association or before an arbitrator appointed by the Probate Court of South Carolina.

    *        *        *        *        *        *        *

VII.  IMPLEMENTATION AND JURISDICTION

    *        *        *        *        *        *        *

    B.    CONTINUING JURISDICTION
            The Probate Court * * * shall maintain continuing jurisdiction to resolve any dis-putes which shall arise during the implemen-tation and enforcement of this settlement agreement. * * *

The 1994 plan for settlement also provided in part as

follows:

THE FOUR CHILDREN UNDERSTAND THAT ANY RESOLUTION OF THE ESTATE ISSUES MUST INCLUDE A COMPLETELY DEFINITIVE APPROACH TO THE DIVISION OF THE ASSETS OF THE PARENT'S [sic] ESTATES.  THE SETTLEMENT SHALL NOT BE FINALIZED UNTIL THE CHILDREN HAVE DETERMINED THE WILLINGNESS OF THEIR FATHER TO ADDRESS THESE ESTATE ISSUES AND ANY CHILD MAY REFUSE TO FINALIZE THE AGREEMENT IF E.E. STONE, III REFUSES TO MAKE THE CHANGES TO HIS ESTATE PLAN PROVIDED FOR HEREIN. * * *

The parties in the litigation among the children included the

above-quoted paragraph in the 1994 plan for settlement because the children were concerned about whether their parents would treat them, as a group, fairly when they decided how to divide their respective assets among their children. As reflected in the above-quoted paragraph, the children intended and agreed that they would not settle and resolve any of the issues involved in the litigation among the children and the children's concerns regarding Mr. Stone's and Ms. Stone's assets unless their parents agreed to make changes to their respective estate plans that were consistent with the provisions of the 1994 plan for settlement relating to such concerns.

In the summer of 1994, Mr. Stone retained David A. Merline (Mr. Merline) to prepare a will for him. Ms. Stone did not retain Mr. Merline; at all relevant times she had her own counsel.

After execution of the 1994 plan for settlement, issues arose with respect to the scope of the authority of the three independent, qualified trustees whom, according to the 1994 plan for settlement, the Probate Court was to select from the four candidates nominated by the children. Issues also arose with respect to whether such three independent, qualified trustees would be fully indemnified in the event of any further litigation against such trustees by any of the children. Because of the unresolved issues relating to the scope of authority and indemni-

fication of the trustees and the fact that the litigation among the children was so hotly contested and bitter, the children were unable to find candidates who were willing to serve as independent trustees of the trusts, and the 1994 plan for settlement did not result in settlement and dismissal of the litigation among the children.

During a period of time starting at least as early as 1994 that is not disclosed by the record, C. Rivers Stone was a member of three organizations: the Young Presidents Organization, the World Presidents Organization, and the Chief Executive Organization (collectively, Management Organizations). At the respective membership meetings of those organizations, various members discussed, inter alia, certain problems that they were having and other members suggested different ways of dealing with such problems. C. Rivers Stone had very close friends who were also members of the Management Organizations and who were aware of the litigation among the children and the children's concerns regarding Mr. Stone's and Ms. Stone's assets. At certain of the respective meetings of those organizations, the members discussed that litigation and those concerns and various ways of dealing with them. Sometime during 1995, certain members of the Management Organizations who were friends of C. Rivers Stone suggested that the children utilize family limited partnerships as a way of resolving the litigation among the children and the children's

concerns regarding Mr. Stone's and Ms. Stone's assets. During that year, C. Rivers Stone informed Mr. Stone, Ms. Stone, and C. Rivers Stone's siblings about that suggestion, and the Stone family became very interested in exploring it.

The primary reason why the Stone family became very interested in exploring the use of family limited partnerships was to resolve the children's concerns regarding Mr. Stone's and Ms. Stone's assets. The Stone family wanted to explore whether such concerns could be resolved by: (1) Actively involving each of the children in the management of certain of their parents' assets during their parents' lives by giving each child the opportunity, through ownership of a general partnership interest in a different family limited partnership, to manage such assets in which such child was interested; and (2) actively involving all of the children in the management of certain of their parents' other assets during their parents' lives by giving all of them the opportunity, through ownership of general partnership interests in a fifth family limited partnership, to manage such assets in which they all were interested. Another very important reason why the Stone family desired to explore the use of family limited partnerships was to settle and bring an end to the litigation among the children. Finally, the Stone family also wanted to explore the use of family limited partnerships as a way to help avoid disputes among the children regarding the ultimate

division of their parents' respective assets after their parents died, although that was not the primary reason for the Stone family's interest in exploring the use of such types of partnerships.

On August 16, 1995, Ms. Fraser and C. Rivers Stone filed a motion in the Probate Court for the following relief:

> **(a)  The appointment of an arbitrator to divide the Cedar Mountain Property;**
> **(b)  To appoint receivers for the Stone Trusts and the Stone Corporations;**
> **(c)  To compel compliance with the * * * [1994 plan for settlement]; and**
> **(d)  For other related relief.**

During the last six months of 1995, Mr. Merline and Mr. Stone discussed the suggestion of C. Rivers Stone's friends regarding the use of family limited partnerships as a means of dealing with the litigation among the children and the children's concerns regarding Mr. Stone's and Ms. Stone's assets. Mr. Merline pointed out to Mr. Stone that the use of family limited partnerships also had potential transfer tax benefits. Mr. Merline explained to Mr. Stone that if Mr. Stone and Ms. Stone were to decide to use family limited partnerships, any assets that he and Ms. Stone decided to transfer to such partnerships would no longer be available to them for their own unfettered, personal use. Instead, as explained to Mr. Stone by Mr. Merline, any assets that he and Ms. Stone decided to transfer to such partnerships would belong to such partnerships and would be

subject to the respective partnership agreements for such partnerships.

On March 28, 1996, the parties in the litigation among the children and their respective attorneys executed an amendment to the 1994 plan for settlement (1996 amendment to the 1994 plan for settlement).  At the time they executed that 1996 amendment, the parties in the litigation among the children contemplated signing a third settlement agreement in which they would amend and restate both the 1994 plan for settlement and the 1996 amendment to that plan, which, as discussed below, they did.  Ms. Stone and Mr. Stone were not parties to the 1996 amendment to the 1994 plan for settlement, and neither of them signed that document.

With respect to the issues relating to the trusts, the 1996 amendment to the 1994 plan for settlement did not change any of the provisions of that plan relating to such issues.

With respect to the issues relating to the children's concerns regarding Mr. Stone's and Ms. Stone's assets, the 1996 amendment to the 1994 plan for settlement provided in part as follows:

> 3. CEDAR MOUNTAIN DIVISION
>
> In implementation of * * * [the paragraph of] the June 3, 1994 Plan of Settlement [requiring arbitration of any disputes among the children regarding section VI of that plan], the parties agree as follows:
>
> > (i)  The parties agree to the two-page Cedar Mountain division map * * * which has been signed by * * * [the children].

(ii) The deeds to 1,054.415 acres [of the Cedar Mountain property] from E.E. Stone III to the Mary Fraser Limited Partnership will reserve for the 1,054.415-acre tract a * * * qualified road right-of-way and utility permanent easements through the adjacent 582.672-acre Life Estate Tract following the route of the existing roads * * *.

\* \* \* \* \* \* \*

(iv) The parties * * * agree to the * * * Piney Mountain [and] Cedar Mountain * * * land appraisals.

4. Family Settlement Estate Planning: The New Limited Partnerships Plan for the Estate.

The parties shall use their reasonable best efforts to encourage E.E. Stone III and Allene W. Stone to establish the five Family Limited Partnerships contemplated by the New Plan for Mr. and Mrs. Stone's estate.

Based upon an analysis of Mr. and Mrs. Stone's assets and expenses, the Children agree to use their reasonable best efforts to encourage Mr. Stone to transfer $1,600,000 of his preferred stock in Stones, Inc. to the Mary Fraser and Rosalie Morris Family Limited Partnerships, in accordance with the "Family Limited Partnership" distribution schedule (the "Chart")[10] hand dated April 12, 1996 * * *.

In the event that assets remaining in E.E. Stone, III's and Allene W. Stone's Limited Partnership (the "Parents' L.P.") as shown in column 7 of the Chart, together with column 8, 9, and 10 and assets of E.E. Stone, III, as managed by E.E. Stone, IV, are not sufficient to pay (a) Mr. and Mrs. Stone's health, maintenance, and other reasonable (1995 standard) expenses; together with (b) estate taxes and expenses of administration payable after their deaths, the deficit shall first be offset by contributions of Jack

---

[10]The "Chart" identified in the 1996 amendment to the 1994 plan for settlement is not attached to the Court's copy of that amendment and is not otherwise part of the record in these cases.

Stone equal to any future gifts made from such column 8, 9, and 10 assets in the Exhibit "A" Chart, before calling on the other three children for parental care contributions, with each Child agreeing to contribute a pro rata share of any remaining shortfall from either personal assets, or * * * assigned income rights from his or her respective Limited Partnership Interests. Provided however, that any further gifts made from such assets now shown on the chart shall first be offset by contributions of Jack Stone Family Limited Partnership.

     *       *       *       *       *       *       *

In order to protect Mary Fraser on the Cedar Mountain Division, a provision will be included in the Family Settlement Agreement recognizing the Children's agreement that Mary Stone Fraser or her Limited Partnership will receive the 1,045.415-acre * * * parcel * * * and that the remainder interest in the remaining 582.672 acres will be given to one or more 501-C-3 charitable organizations recommended by Mary Fraser which are mutually agreeable to Mr. Stone and the other Children, with Mr. Stone retaining a life estate in the 582.672 acres. The Children shall use their reasonable best efforts to encourage Mr. Stone to convey the 582.672-acre Cedar Mountain property remainder interest according to the foregoing provision.

The Family Settlement Agreement will acknowledge that in the event Mr. Stone executes a new Will, Codicil or other agreement which does not conform to the distribution outlined in the Chart, the Children nonetheless agree to abide by the terms of such distribution in the Chart as a Family Settlement Agreement pursuant to SC Code Sec. 62-3-1101, et seq.; and * * * to include whatever provisions are necessary to preserve any applicable marital deductions.

The 1996 amendment to the 1994 plan for settlement also provided in part as follows:

9. The Family Estate Plan set forth herein represents a compromise by the parties. There shall be no implementation of the Family Estate Plan * * * unless and until there is an agreement between the parties [in the litigation among the children] to an Amended and Restated Plan for Settlement.

After execution of the 1996 amendment to the 1994 plan for settlement, the children entered into intense negotiations regarding the particular assets that each child wanted their parents to transfer to a family limited partnership in which such child, as well as each of their parents, would hold a partnership interest.

Between the last six months of 1995 and April 1997, Mr. Merline met with Mr. Stone approximately a dozen times to discuss the use of family limited partnerships, the status of the children's negotiations, and why each child had an interest in certain of the respective assets of Mr. Stone and Ms. Stone. Around April 1996, Mr. Stone and Ms. Stone decided to proceed with forming five family limited partnerships. To that end, at Mr. Stone's request, Mr. Merline drafted five partnership agreements (draft partnership agreements) and circulated those draft partnership agreements among Mr. Stone, Ms. Stone, the children, and their respective attorneys. The children and their respective attorneys, inter alia, made comments on the draft partnership agreements that Mr. Merline had sent them and suggested changes to those agreements. The primary reason for the changes suggested by the children to the draft partnership agreements was the desire of the children to ensure that their parents, and in particular Mr. Stone, would not be unduly influenced by anyone to act in a manner inconsistent with each child's interest in

managing particular assets of their parents during their parents' lives and thereafter.

Mr. Stone agreed with certain of the children's comments and certain of their suggested changes to the draft partnership agreements that Mr. Merline had prepared for Mr. Stone, and Mr. Merline made changes to those draft partnership agreements in order to incorporate such comments and suggested changes. For example, one new provision incorporated into all five of the draft partnership agreements prevented anyone who obtained a power of attorney on behalf of Mr. Stone from using that power of attorney to vote any general partnership interest that Mr. Stone was to receive in each of the proposed five family limited partnerships. Another example was a new provision included only in the draft partnership agreement for the proposed partnership in which C. Rivers Stone was to hold a general partnership interest and in the draft partnership agreement for the proposed partnership in which Ms. Fraser was to hold a general partnership interest. That new provision required the unanimous consent of all the prospective general partners of each such prospective partnership in order to authorize such partnership to sell, transfer, assign, exchange, lease, convey, subdivide, partition, or encumber certain of the Piney Mountain property in the case of the proposed partnership in which C. Rivers Stone was to own a general partnership interest and certain of the Cedar Mountain

property in the case of the proposed partnership in which Ms. Fraser was to own a general partnership interest.

On May 9, 1996, Mr. Stone and Eugene Earle Stone, IV, as both general partners and limited partners, and Ms. Stone, as a limited partner, executed a partnership agreement for a limited partnership that the Stone family intended to name The Eugene E. Stone, III, Limited Partnership (ES3LP).

On May 9, 1996, Mr. Stone and Eugene Earle Stone, IV, as both general partners and limited partners, and Anne M. Stone,[11] as a general partner, executed a partnership agreement for a limited partnership that the Stone family intended to name The E.E. Stone, IV, Limited Partnership (ES4LP).

On May 9, 1996, Mr. Stone, C. Rivers Stone, and Charles Rivers Stone, Jr.,[12] as both general partners and limited partners, and Frances O. Stone,[13] as a limited partner, executed a partnership agreement for a limited partnership that the Stone family intended to name The C. Rivers Stone Limited Partnership (CRSLP).

On May 9, 1996, Mr. Stone and Ms. Morris, as both general partners and limited partners, Mr. Morris, as a general partner,

---

[11]Anne M. Stone is the spouse of Eugene Earle Stone, IV.

[12]Charles Rivers Stone, Jr., is the son of C. Rivers Stone.

[13]Frances O. Stone is the daughter of C. Rivers Stone.

and Charles H. Morris, Jr.,[14] and Ms. Morris as custodian for Rosalie S. Morris, II,[15] as limited partners, executed a partnership agreement for a limited partnership that the Stone family intended to name The Rosalie Stone Morris Limited Partnership (RSMLP).

On May 9, 1996, Mr. Stone, Ms. Fraser, Wyman Fraser Davis (Ms. Davis),[16] and Laura Lawton Fraser Arnal (Ms. Arnal),[17] as both general partners and limited partners, executed a partnership agreement for a limited partnership that the Stone family intended to name The Mary Stone Fraser Limited Partnership (MSFLP).

Each of the partnership agreements for the Five Partnerships set forth the following purposes of each such partnership:

> to consolidate the management of certain property of the family of EUGENE E. STONE, III (the "Family"); to make a profit; to avoid the division of the property of the Family which is in the Partnership in order to promote the greater sales potential of the property; to avoid potential expensive litigation and disputes over the property of the Family by defining the roles and rights of Family members in the property, and providing procedures to resolve disputes; to restrict the transfer of interests in the property to non-Family members; to establish protection of Family interests from interference and disruption resulting from claims by poten-

---

[14]Charles H. Morris, Jr., is the son of Ms. Morris.

[15]Rosalie S. Morris, II, is the daughter of Ms. Morris.

[16]Wyman Fraser Davis, also known as Mary Wyman Stone Fraser Davis, is the daughter of Ms. Fraser.

[17]Ms. Arnal is the daughter of Ms. Fraser.

tial creditors of any Family member; to establish a combined investment policy for the Partnership; to reduce the mechanics and costs of administration of investments; * * * to facilitate the administration and reduce the costs associated with the probate of the estates of Family members; * * * to provide flexibility in business and estate planning not available through trusts, corporations or other business entities; to reduce transaction costs and multiple deeds in transferring property among Family members; * * * and acquiring, financing, developing, subdividing, managing, improving, operating, leasing, mortgaging, refinancing, pledging, selling or otherwise dealing with the Partnership Property * * *.

Each of the partnership agreements for the Five Partnerships provided that distributions to partners may be made from each such partnership only after, inter alia, determining whether the financial condition of each such partnership permitted such distributions. Each of the partnership agreements for the Five Partnerships further provided that all distributions to the partners of each such partnership must, "Unless otherwise agreed by all the Partners in writing, * * * be made simultaneously to each of the Partners and must be made in proportion to the Partners' Partnership Units."

The children understood that Mr. Stone and Ms. Stone would make the ultimate decision as to which, if any, of their parents' respective assets their parents would transfer to each of the Five Partnerships. In this connection, although Mr. Stone and Ms. Stone agreed to form the Five Partnerships, they did not intend to transfer all of the respective assets that they owned to such partnerships in exchange for partnership interests. That

was because they wanted to retain sufficient assets to enable them to maintain their respective accustomed standards of living. To that end, Mr. and Ms. Stone retained certain accountants to advise them as to what assets they should retain, and not transfer, to each of the Five Partnerships. In order to formulate such advice, those accountants performed various cashflow analyses and appraisals, using different assumptions regarding the respective life expectancies of Mr. Stone and Ms. Stone and the anticipated returns on their respective investments. The accountants retained by Mr. Stone and Ms. Stone recommended that they retain, and not transfer, to the Five Partnerships total assets that would yield a monthly total cashflow of between $12,000 and $15,000.

The Stone family intended and agreed that all the partners of each of the Five Partnerships were to receive respective partnership interests in each such partnership that were proportionate to the fair market value of the assets that such partners respectively transferred to such partnership. To that end, during the period May 1996 through March 1997, before any of the partners of each of the Five Partnerships transferred any assets to such partnership, the process (prefunding process) of identifying, describing, and obtaining various appraisals of the respective assets of Mr. Stone and Ms. Stone took place. That process was critical to enabling Mr. Stone, Ms. Stone, and the

children to make decisions about what assets to transfer to each of the Five Partnerships. During the prefunding process, various disputes arose regarding, inter alia, the appraisals of certain assets and the desire of Ms. Fraser, which her three siblings strongly opposed, that Mr. and Ms. Stone make Anne Logan Ministries a charitable beneficiary of certain of the Cedar Mountain property. Those disputes took time to resolve, and, in the case of the disputes regarding the appraisals of certain assets of Mr. Stone and Ms. Stone, new appraisals had to be obtained. Until resolution of all of the disputes that arose during the prefunding process, (1) the parties in the litigation among the children did not enter into the third settlement agreement that they contemplated when they executed the 1996 amendment to the 1994 plan for settlement, and (2) the partners of each of the Five Partnerships were not able to determine what assets were to be transferred to each such partnership.

On October 15, 1996, Mr. Stone and Eugene Earle Stone, IV, as general partners, filed a certificate of limited partnership for ES3LP with the Secretary of State of South Carolina (S.C. Secretary of State), thereby forming ES3LP under the laws of that State.

On October 15, 1996, Mr. Stone, Eugene Earle Stone, IV, and Anne M. Stone, as general partners, filed a certificate of limited partnership for ES4LP with the S.C. Secretary of State,

thereby forming ES4LP under the laws of the State of South Carolina.

On October 15, 1996, Mr. Stone, C. Rivers Stone, and Charles Rivers Stone, Jr., as general partners, filed a certificate of limited partnership for CRSLP with the S.C. Secretary of State, thereby forming CRSLP under the laws of the State of South Carolina.

On October 15, 1996, Mr. Stone, Ms. Morris, and Mr. Morris, as general partners, filed a certificate of limited partnership for RSMLP with the S.C. Secretary of State, thereby forming RSMLP under the laws of the State of South Carolina.

On October 15, 1996, Mr. Stone, Ms. Fraser, Ms. Davis, and Ms. Arnal, as general partners, filed a certificate of limited partnership for MSFLP with the S.C. Secretary of State, thereby forming MSFLP under the laws of the State of South Carolina.

On January 31, 1997, Mr. Stone was diagnosed with cancer of the gallbladder. Prior to that time, Mr. Stone had been in good health, did not have any known serious health problems, and was active and alert. After Mr. Stone was diagnosed with cancer, it was the doctors' prognosis that he would live a period of months.

By late March 1997, Mr. and Ms. Stone had become satisfied that the amount of assets that their accountants had recommended they retain, and not transfer to, each of the Five Partnerships was sufficient to enable them to maintain their respective

accustomed standards of living, and they decided to follow their accountants' recommendations. By that time, all of the disputes that arose during the prefunding process had been resolved, and Mr. Stone, Ms. Stone, and the other partners of each of the Five Partnerships had agreed on the identities and the values of the assets that they would transfer to each such partnership. Eugene Earle Stone, IV, had a particular interest in managing, and maintaining the value of, the preferred stock of Stones, Inc., and it was decided that approximately $1 million[18] of such stock, as well as certain other property, was to be transferred to ES4LP. C. Rivers Stone had a particular interest in managing Mr. Stone's Piney Mountain property, and it was decided that various parcels of that property totaling 366.097 acres, as well as certain other property, were to be transferred to CRSLP.[19] Ms.

---

[18]The record does not disclose the precise value of each of the assets transferred to each of the Five Partnerships as of the date of each such transfer to each such partnership. However, the record establishes the precise value of each of the assets owned by each such partnership on the respective dates of the deaths of Mr. Stone and Ms. Stone. The parties agree that, after the gifts by Mr. Stone of certain partnership interests in ES4LP, CRSLP, RSMLP, and MSFLP (described below) to Eugene Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser, respectively, all the partners of each of those four partnerships (as well as ES3LP) received, as the Stone family intended and agreed, respective percentage interests in each such partnership that were proportionate to the fair market value of the assets that such partners respectively transferred to each such partnership.

[19]The parties stipulated that a one-percent interest in each of various parcels totaling 366.949 acres of the Piney Mountain property was transferred from Mr. Stone to C. Rivers Stone and

(continued...)

Morris had a particular interest in managing certain of her parents' stock and securities, including at least some of Mr. Stone's preferred stock in Stones, Inc., and it was decided that various stock and securities, including approximately $642,000 of such preferred stock, as well as certain other property, was to be transferred to RSMLP. Ms. Fraser had a particular interest in managing her parents' Cedar Mountain property, and it was decided that the 1054.415-acre parcel of that property, as well as certain other property, was to be transferred to MSFLP. All of the children had a particular interest in the Cherrydale residence, and it was decided that that property, as well as certain other property, was to be transferred to ES3LP.

On April 4, 1997, Mr. Stone, as both a general partner and a limited partner, Eugene Earle Stone, IV,[20] C. Rivers Stone, Ms. Morris, and Ms. Fraser, as general partners, and Ms. Stone, as a limited partner, executed an amended and restated partnership

---

[19](...continued)
that Mr. Stone and C. Rivers Stone transferred to CRSLP their respective interests in those 366.949 acres of that property. Those stipulations are clearly contrary to the deeds relating to such transfers, and we shall disregard such stipulations. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). Those deeds show that a total of 366.097 acres of various parcels of the Piney Mountain property was the subject of such transfers.

[20]As of Apr. 4, 1997, Eugene Earle Stone, IV, was no longer both a general partner and a limited partner of ES3LP; he was only a general partner.

agreement for ES3LP.[21]  The purpose of that amended and restated partnership agreement was to make C. Rivers Stone, Ms. Morris, and Ms. Fraser general partners of ES3LP.

On April 5, 1997, the parties in the litigation among the children and their respective attorneys executed two documents[22] dated as of March 31, 1997, the purpose of which was to settle that litigation and to resolve the issues relating to the children's concerns regarding Mr. Stone's and Ms. Stone's assets (collectively, the 1997 amended and restated plan for settlement).  The 1997 amended and restated plan for settlement amended and restated the 1994 plan for settlement and the 1996 amendment to that plan.  Ms. Stone was not a party to the 1997 amended and restated plan for settlement, and she did not sign those documents.  Mr. Stone signed the 1997 amended and restated plan for settlement--trusts and estate only in his capacity as a preferred stockholder of Stones, Inc.[23]  Mr. Stone signed the 1997 amend

---

[21]On Apr. 11, 1997, Mr. Stone, Eugene Earle Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser, as general partners, filed a first amendment to the certificate of limited partnership for ES3LP with the S.C. Secretary of State, which reflected the amended and restated partnership agreement for ES3LP executed on Apr. 4, 1997.

[22]The two documents were referred to as "Amended and Restated Plan for Settlement-Trusts and Estate" (1997 amended and restated plan for settlement--trusts and estate) and "Amended and Restated Plan for Settlement-Company (1997 amended and restated plan for settlement--Company).

[23]It was necessary for Mr. Stone to sign the 1997 amended
(continued...)

ment and restated plan for settlement--Company only in his capacity as a preferred stockholder of Stones, Inc.[24]

With respect to the issues relating to the trusts, the 1997

---

[23](...continued)
and restated plan for settlement--trusts and estate in his capacity as a preferred stockholder of Stones, Inc., because that document provided:

> E.E. Stone, III will convey or assign directly or indirectly the preferred stock * * * to the Limited Partnerships [ES4LP, RSMLP, and MSFLP] created as part of the New Plan for Estate in accordance with the Chart referenced in paragraph III.H. The preferred stock shall be changed to eliminate its voting rights, or, if not so changed at the time of the conveyance or assignment, then the Children and Grandchildren shall use their reasonable best efforts to persuade E.E. Stone, III, in his capacity as General Partner of the respective Limited Partnerships, to consent to these changes.

[24]It was necessary for Mr. Stone to sign the 1997 amended and restated plan for settlement--Company in his capacity as a preferred stockholder of Stones, Inc., because that document provided:

> The Company shall offer to exchange the preferred stock in Stones [Inc.] currently held by E.E. Stone, III for new preferred stock in Stones [Inc.] which shall be classified as non-voting stock in all events ("New Preferred Stock"). * * *

> The Company shall have the right beginning in 1999 and for each year thereafter to redeem New Preferred Stock equal to 20% of the New Preferred Stock outstanding on January 1, 1999 on a pro rata basis until all New Preferred Stock has been redeemed. The New Preferred Stock if redeemed by the Company, in its sole discretion, shall be redeemed based on a 1996 appraised value of the preferred stock by Houlihan, Lokey, which estimates the value of the 5,100 shares of preferred stock at $4,462,500, so that the redemption price of any redeemed share shall at all times be $875.00 per share plus any dividends declared but not yet paid.

amended and restated plan for settlement--trusts and estate

provided in part as follows:

    II.   TRUST ISSUES

        A.    EXISTING TRUSTS

            (a)   <u>Administrative Transfer to New Trusts</u>
The existing trusts established by the 1976 Agreement and Declaration of Trust ("Existing Trusts") will remain in existence as two (2) trusts.  Upon receipt by the parties of a favorable Private Letter Ruling * * * the Probate Court shall release * * * [documents relating to the administrative division of the Trusts] from escrow, and thereby administratively establish eleven New Trusts * * *.

It is the intent of the parties that the release of the Trust-related Plan Documents implements the Trust-related aspects of the settlement and that no further action by the parties shall be necessary to effect the administrative division of the two Existing Trusts into eleven New Trusts (as defined herein), the installation of the New Trustees (as defined herein) and the funding of these New Trusts or that any such action be ministerial and not discretionary in nature.

The failure of a beneficiary to identify an Independent Trustee who has executed the Certification and Acceptance and is willing to serve over his or her New Trust shall not delay the release or implementation of the Trust-related Plan Documents.  In the event an Independent Trustee selected by a beneficiary cannot be installed over a New Trust at the time the Probate Court releases the Trust-related Plan Documents from escrow, that beneficiary's New Trust shall be administered by the Existing Trustees until such time as that beneficiary

obtains an Independent Trustee who is willing to serve as the Independent Trustee of that beneficiary's New Trust on the terms and conditions set forth in the Amended Plan and Trust-related Plan Documents.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) For purposes of this Amended Plan, a Trustee of a New Trust is "qualified" if he or she is a capable and responsible individual; a Trustee of a New Trust is "Independent" if that individual is not related by blood or marriage to any Child or Grandchild (hereinafter "Independent Trustee"). * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

H. UNDERSTANDING OF DISTRIBUTION PROVISIONS

The distributions from the New Trusts shall be in accordance with the provision of the Existing Trusts. In this respect, there has been a legitimate dispute as to the interpretation of the Existing Trust provisions. The parties acknowledge that the language, intent and circumstances relating to the Existing Trusts are such that any income received or generated by the New Trusts shall be distributed in accordance with the distribution standards and provisions of the 1976 Trust Agreement, as restated in the New Trusts. * * *

With respect to the issues relating to the children's concerns regarding Mr. Stone's and Ms. Stone's assets, the 1997 amended and restated plan for settlement--trusts and estate provided in part as follows:

III. ESTATE ISSUES

A. GENERAL

It is contemplated that prior to the release of the Amended Plan and Plan Docu-

ments from escrow,[25] the estate matters set forth in this Section will have been agreed to by E.E. Stone, III and Allene W. Stone and all documents necessary to fully fund the Family Limited Partnerships and to otherwise implement the Estate Section of the Amended Plan will have been executed and placed in escrow * * *. The parties understand that E.E. Stone, III and Allene W. Stone have the right to make such estate decisions as they deem appropriate. In the event they do not adopt the estate plan set forth in this Section, the Amended Plan shall not be effective unless and until an alternative estate plan is agreed to.

B.   TESTAMENTARY TRUSTS

There shall be no trusts for descendants under the Wills of E.E. Stone, III or Allene W. Stone. After the death of the first of E.E. Stone, III or Allene W. Stone, the portion of the estate not going to the surviving spouse shall, after payment of estate taxes and expenses of administration, be distributed equally and directly to each of the four Children or that Child's estate, provided, however, that the decedent's interest in each of the Children's Limited Partnerships shall be distributed directly to the Child for whose Partnership such interest is held. After the death of the surviving spouse, the assets remaining in the estate of E.E. Stone,

---

[25]With respect to the "escrow" referred to in paragraph A of section III of the 1997 amended and restated plan for settlement--trusts and estate, that plan provided in part as follows:

Executed copies of * * * [this amended plan] and all documents specified therein ("Plan Documents") shall be placed in escrow with the Probate Court. * * * [this amended plan] and Plan Documents shall not be effective unless and until they are released from escrow by the Probate Court * * *.

As discussed below, on Apr. 5, 1997, the Probate Court entered an order approving the 1997 amended and restated plan for settlement.

III and/or Allene W. Stone shall, after payment of estate taxes and expenses of administration, be distributed equally to the four Children or that Child's estate, subject, however, to the provision that the decedent's interest in each of the Children's Limited Partnerships shall be distributed directly to the Child for whose Partnership such interest is held.

C.    FAMILY SETTLEMENT AGREEMENT
The Children and Grandchildren (or their guardians ad litem) and the Stone Foundation (if necessary) have executed a Family Settlement Agreement (pursuant to S.C. Code § 62-3-1101 et seq.) which provides for a division inter se [sic] of the estates of E.E. Stone, III and Allene W. Stone in the manner set forth in this Section III in the event E.E. Stone, III or Allene W. Stone fail to maintain their Wills in the same manner.  The Family Settlement Agreement acknowledges that in the event E.E. Stone, III executes a new Will, Codicil or other agreement which does not conform to the distribution outline in the "Stone Family Limited Partnership Distribution Schedule" dated April 3, 1997 and attached hereto as Exhibit "J" ("the Chart") and in this Amended Plan, the Children nonetheless agree (a) the distribution outlined in such Chart and in this Amended Plan is fair and equitable; (b) to abide by the terms of such distribution as a Family Settlement Agreement pursuant to  South Carolina Code § 62-3-1101, et seq.; and (c) to include whatever provisions are necessary to preserve any applicable marital deductions. * * *

*        *        *        *        *        *        *

E.    STONE FOUNDATION
The Stone Foundation shall be divided into four separate, equal, and entirely independent foundations with each Child (and/or designee) as one of the trustees(s) of one separate foundation, but with 20% of the required income to be distributed by E.E. Stone, III to his favorite church, and/or

other charities during his lifetime.  The parties shall take all steps necessary to establish and fund the four foundations within ten (10) business days of the entry of the Escrow Order.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

H.　　NEW PLAN FOR ESTATES

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In the event that assets remaining in the Parents' L.P. [ES3LP] as shown in column G,[26] together with assets listed in column H and other assets of E.E. Stone, III are not sufficient to pay health, maintenance, and other reasonable (1995 standard) expenses for E.E. Stone, III and Allene W. Stone, the deficit shall [be] borne equally by assets in the four Children's Limited Partnerships.  If the assets in the residuary estate of E.E. Stone, III and the Parents' L.P. are insufficient to pay estate tax or expenses of administration payable after their deaths, any remaining estate tax or expenses of administration shall be borne equally by assets in the four Children's Limited Partnerships.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The Children shall use their reasonable best efforts to encourage E.E. Stone, III, to agree to the following:  (a) to rent the Cherrydale house to Stone Manufacturing Co. until it is sold to Stone Manufacturing Co. for its fair market value as determined by a competent appraiser (which appraisal shall include, among other things the cost of the rennovation [sic] and the new furniture and fixtures) agreed to by the Buyer and Seller and (b) to revise his Will accordingly.  Upon the \* \* \* death of E.E. Stone, III, the nec-

---

[26]It is not clear from the record the columns to which paragraph H of section III of the 1997 amended and restated plan for settlement--trusts and estate referred.

essary portion of the proceeds from the life insurance policy maintained on E.E. Stone, III, by Stone Manufacturing Co. shall be reserved and used by Stone Manufacturing Co. to consumate [sic] the purchase of the Cherrydale house.

[I.]  CEDAR MOUNTAIN DIVISION
     The division of Cedar Mountain for purposes of the Chart and the Mary Fraser Limited Partnership shall be as follows:

> (1)  The parties agree to the two-page Cedar Mountain division map * * * which has been signed by * * * [the children]. * * *
>
> (2)  The deeds to 1,054.415 acres from E.E. Stone, III, to the Mary Fraser Limited Partnership will reserve for the 1,054.415-acre tract a * * * qualified road right-of-way and utility permanent easements through the adjacent 582.672-acre Life Estate Tract following the route of the existing roads * * *.
>
> (3)  A provision shall be included in the Family Settlement Agreement acknowledging the Children's agreement that the Mary Fraser Limited Partnership shall receive the Mary Fraser Parcel, and that the remainder interest in the Life Estate Parcel shall be given to Ann [sic] Logan Ministries, Inc., a 501(c)(3) charitable organization, with E.E. Stone, III, retaining a life estate in the Life Estate Parcel.

*       *       *       *       *       *       *

L.   MAINTENANCE OF PARENTS
     The four Children, shall jointly bear the responsibility for the financial maintenance of E.E. Stone, III and Allene W. Stone during their lives, utilizing the assets

available to the parents ("Parental Assets")
for such maintenance in the same or better
manner as in recent years. * * *

* * * Mary Stone Fraser shall be dele-
gated responsibility for the management of
the care for Allene W. Stone, supported by
others.  Allene W. Stone may be moved with
Mary Fraser, including to the residence of
E.E. Stone, III if he is ever incapacitated
and unable to occupy the residence * * *.

The 1997 amended and restated plan for settlement--trusts
and estate further provided in part as follows:

IV.  IMPLEMENTATION AND JURISDICTION

    *       *       *       *       *       *       *

    B.   CONTINUING JURISDICTION
         The Probate Court * * * shall maintain
    continuing jurisdiction to resolve any Trust-
    related disputes which shall arise during the
    implementation and enforcement of this set-
    tlement agreement.  The parties will seek to
    have a hearing on the Amended Plan as soon as
    practicable after its execution.

Neither Mr. and Ms. Stone nor the children anticipated that

their parents would need any financial assistance during their

parents' respective lives.  As discussed above, after consulting

with their accountants, Mr. Stone and Ms. Stone retained, and did

not transfer to the Five Partnerships, total assets that they

believed would enable them to maintain their respective accus-

tomed standards of living.  Nonetheless, the parties in the

litigation among the children included paragraphs H and L of

section III in the 1997 amended and restated plan for settlement-

-trusts and estate in order to address and resolve the possibil-

ity that their parents might need financial assistance during their parents' respective lives. Those paragraphs reflected the children's agreement that, in the unlikely event that the total assets held by ES3LP and the total assets owned by Mr. Stone and Ms. Stone were insufficient to enable them to maintain their respective accustomed standards of living, the children, as a group, would share equally in providing for the maintenance of their parents at such standards of living through distributions of equal amounts from ES4LP, CRSLP, RSMLP, and MSFLP, respectively.

The parties in the litigation among the children also addressed in paragraph H of section III of the 1997 amended and restated plan an issue relating to estate taxes and estate administration expenses payable after Mr. Stone and Ms. Stone died. Those parties resolved that issue by agreeing in that paragraph that, in the event the total assets in Mr. Stone's residuary estate and the total assets owned by ES3LP were not sufficient to pay estate taxes and estate administration expenses owing as a result of their parents' respective deaths, the children, as a group, would share equally in paying any such taxes and expenses through distributions of equal amounts from ES4LP, CRSLP, RSMLP, and MSFLP, respectively.

The 1997 amended and restated plan for settlement--Company provided in part as follows:

PREAMBLE

This "Amended and Restated Plan for Settlement-Company" sets forth the provisions of the parties' settlement relating to Stones, Inc. ("Stones") and Stone Manufacturing Co. ("SMC") (and their subsidiaries) and amends and restates the Plan for Settlement dated June 3, 1994 and the First Amendment dated as of March 28, 1996 among the same parties.

## I. EFFECT OF THE AMENDED PLAN

(a) Executed copies of this Amended and Restated Plan for Settlement - Company and all documents specified herein ("Plan Documents") shall be placed in escrow with the Probate Court and shall not be effective unless and until they are released from escrow by the Probate Court * * *.

## II. COMPANY

### A. GENERAL

Stones and SMC may be merged * * * provided such merger does not violate the provisions of any agreement for borrowed money to which Stones or SMC is a party, but no merger is required. In the event the merger does occur, any reference contained in this Amended Plan to the "Company", its Board, its officers, its shareholders, its Common Stock and its obligations shall refer to the surviving entity of the merger, its Board, its Nominating Committee, its officers, its shareholders, its Common Stock and its obligations. In the event the merger does not occur and Stones and SMC continue to exist as separate entities, except to the extent otherwise provided herein, any reference contained in this Amended Plan to the "Company", its Board, its Nominating Committee, its officers, its shareholders, its Common Stock and its obligations shall refer to each of Stones and SMC separately, as to its own Board, its Nominating Committee, its officers, its shareholders, its Common Stock and its obligations.

\*   \*   \*   \*   \*   \*   \*

**C.**   **BOARD OF DIRECTORS - SELECTION OF DIRECTORS**

E.E. Stone, IV and C. Rivers Stone shall both be selected as initial members of the Board.  At least three members of the Board shall be independent outside directors; provided, however, that the Board initially may be comprised solely of management representatives \* \* \* prior to the proposed initial public offering of equity securities ("IPO") of Stones, SMC or the surviving entity of the merger \* \* \*.

\*   \*   \*   \*   \*   \*   \*

**IV.**   **OWNERSHIP OF COMPANY**

**A.**   **MERGER OF STONES AND SMC**

Stones and SMC may be merged \* \* \*.  The shareholders agree to vote their stock in favor of any such merger that is recommended by the Board.

\*   \*   \*   \*   \*   \*   \*

**B.**   **SHARE EXCHANGE**

The shares of Common Stock of SMC, now held by E.E. Stone, IV, C. Rivers Stone, Mary Stone Fraser and Rosalie Stone Morris, the shares of Common Stock of Stones, held by the Existing Trusts \* \* \* may be exchanged or otherwise changed to align their shares \* \* \* at the Stones corporate level in a transaction recommended by the Board. \* \* \*

\*   \*   \*   \*   \*   \*   \*

The shareholders agree to vote their stock in favor of a share exchange consistent with this provision that is recommended by the Board and to exchange their shares as required.

\*   \*   \*   \*   \*   \*   \*

**I.**   **PREFERENTIAL RIGHT TO SELL COMMON STOCK**

The New Trusts for Mary Stone Fraser, Mary Wyman Stone Fraser Davis and Laura Lawton Stone Fraser Arnal (the "Fraser New Trusts"), the New

Trusts for Rosalie Stone Morris, Charles Hill Morris, Jr., and Rosalie Morris (the "Morris New Trusts"), and the New Trusts for Chris Stone, Frances Stone and Rosalie Stone shall have the right (but not the obligation) to dispose of their entire holding of Common Stock in the IPO and in a subsequent offering, should they choose to do so. Mary Stone Fraser and Rosalie Stone Morris shall have the right to sell their directly owned shares in either the initial or subsequent offering. * * *

**J.   SALE OF THE COMPANY**

The Board, with the approval of the shareholders * * * may effect a sale of the Company or other sale involving all of the stock or substantially all of the assets of the Company upon such terms and conditions as shall be determined by the Board.

*        *        *        *        *        *        *

**M.   DIVIDEND PAYMENTS**

(a)   To the extent actually permitted under all financing arrangements to which SMC is a party, SMC shall pay a dividend to the shareholders in 1997 of $1 million for fiscal year 1996 to shareholders of record as of December 31, 1996. * * *

(b)   Mandatory dividends on all Common Stock of SMC shall be determined, and to the extent permitted under all financing arrangements to which SMC is a party paid to the shareholders as soon as practicable after the end of each fiscal year in which consolidated net after-tax earnings * * * for that year exceed $5 million * * *.

*        *        *        *        *        *        *

**VII. IMPLEMENTATION AND JURISDICTION**

*        *        *        *        *        *        *

**B.   CONTINUING JURISDICTION AND FURTHER ASSURANCES**

The parties agree to take whatever additional

actions and execute whatever additional documents are reasonably necessary to accomplish the provisions hereof * * *. The Probate Court * * * shall maintain exclusive continuing jurisdiction to resolve any disputes which shall arise during the implementation and enforcement of the Amended Plan and the Company-related Plan Documents. The parties will seek to have a hearing on the Amended Plan as soon as practicable after its execution.

Because, as discussed above, the Probate Court continued to retain jurisdiction over any issues relevant to the litigation among the children, the parties in that litigation submitted the 1997 amended and restated plan for settlement to the Probate Court for approval. Until and unless the Probate Court approved that plan, none of the partnerships was to be funded. On April 5, 1997, the Probate Court entered an order approving the 1997 amended and restated plan for settlement, finding it to be fair and equitable to all of the parties to that plan and consistent with South Carolina law.

On April 5, 1997, the children and their respective children entered into a family settlement agreement, as provided for in the 1997 amended and restated plan for settlement--trusts and estate. That agreement provided in part as follows:

WHEREAS, in furtherance of an estate plan which has been developed for Mr. and Mrs. Stone, the parties to this Family Settlement Agreement entered into an Amended and Restated Plan For Settlement, (the "Plan") [the 1997 amended and restated plan for settlement], * * *

WHEREAS, pursuant to the Plan, the Family persuaded Mr. and Mrs. Stone to execute new Wills, (collectively the "New Wills") [Mr. Stone's will executed

on April 5, 1997, discussed below, and Ms. Stone's will executed on May 3, 1997, discussed below] * * *.

WHEREAS, being mindful that Mr. and Mrs. Stone could subsequently execute other wills or codicils and revoke or amend the New Wills, the Family has agreed, pursuant to the Plan, to enter into this Family Settlement Agreement, the terms and provisions of which are consistent with the New Wills and the Plan, and which is intended to resolve the * * * [litigation among the children and the children's concerns regarding Mr. Stone's and Ms. Stone's assets] as it relates to any future will contest concerning the proper disposition of Mr. Stone's estate and Mrs. Stone's estate upon their respective deaths.

    \*        \*        \*        \*        \*        \*        \*

2. <u>Terms of Family Settlement Agreement include those of the Plan and New Wills</u>. If either Mr. or Mrs. Stone executes any subsequent will or codicil, or otherwise effectively revokes the New Wills, which would cause a distribution from their estates to the Family in a manner inconsistent with the Plan or the New Wills, then that portion of their estates which was left to the Family under the subsequent will or codicil shall pass to the Family according to the provisions of the Plan and the New Wills [Mr. and Ms. Stone's New Wills] as set forth in Exhibits A, B and C and this Family Settlement Agreement. * * *

3. <u>State Law to Govern</u>. This Family Settlement Agreement shall be construed, regulated and governed by and in accordance with the laws of the State of South Carolina, notwithstanding the residence in any other jurisdiction of any member of the Family.

On April 5, 1997, Mr. Stone executed his last will and testament (Mr. Stone's will). Mr. Stone's will provided in part as follows:

(1) <u>Prior Wills</u>. I hereby revoke all other wills and codicils heretofore made by me.

(2) <u>Debts, Expenses and Mortgages</u>. I direct my Personal Representative to pay my legal debts, my

funeral expenses, any unpaid expenses of my last illness, and the cost of a suitable tombstone or marker for my grave.  Such debts and expenses shall first be paid out of and charged against the EUGENE E. STONE, III LIMITED PARTNERSHIP, or any proceeds received by my estate from any individual retirement account or deferred compensation.  In the event these sources of funds are insufficient to pay such debts and expenses, then such remaining debts and expenses shall be paid out of and charged equally against the limited partnerships established by me for my children.  In the event there are insufficient assets in a limited partnership established by me for a child of mine to pay an equal amount of such remaining debts and expenses, then the child of mine who received or receives an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of an equal amount of any such remaining debts and expenses. * * *

    (3)   <u>Taxes</u>. * * *

    (a)   Except as provided * * * below, I direct that all estate, generation-skipping transfer, inheritance, transfer, succession, death, or similar taxes which may be assessed or imposed upon or with respect to any interest in a limited partnership established by me for a child of mine which is included in my gross estate for the purpose of such taxes * * * shall be paid out of and charged against such limited partnership, and shall not be charged against the marital deduction.  In the event there are insufficient assets in a limited partnership established by me for a child of mine to pay such taxes, then the child of mine who received or receives an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of any such remaining taxes.

    (b)   Except as provided in Paragraph (3)(c) below, I direct that any taxes which may be assessed or imposed by Section 2035(c) of the Internal Revenue Code, as amended, or corresponding provision of state law, including any interest or penalties thereon, as a result of any

gift tax paid or payable with respect to any interest in any limited partnerships established by me for my children which were the subject of any gifts made by me during my lifetime, shall be paid out of and charged equally against such limited partnerships, and shall not be charged against the marital deduction.  In the event there are insufficient assets in a limited partnership established by me for a child of mine to pay an equal amount of such taxes, then the child of mine who received a gift of an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of an equal amount of any such remaining taxes.

(c)   In the event the Internal Revenue Service or any other taxing authority changes the value attributable to (i) any assets I have contributed to a limited partnership established by me for a child of mine * * * then I direct that all gift, estate, generation-skipping transfer, inheritance, transfer, succession, death, or similar taxes which may be assessed or imposed as a result of such change in value, * * * shall be paid out of and charged against the limited partnership that received such contribution * * * and shall not be charged against the marital deduction.  In the event there are insufficient assets in a limited partnership established by me for a child of mine to pay such taxes, then the child of mine who received such gift, or whose limited partnership received such contribution, or such child's estate, as the case may be, shall be responsible for the payment of any such remaining taxes.

(d)   I direct that all other estate, generation-skipping transfer, inheritance, transfer, succession, death, or similar taxes, including any interest or penalties thereon, payable by reason of my death * * * or assessed or imposed with respect to my estate, or any part thereof, whether or not passing under this will, or any codicil thereto, including all policies of insurance on my life, all

bequests and devises, all transfers made by me during my lifetime, all jointly held property, all pension and profit-sharing benefits, deferred compensation benefits and individual retirement accounts, and all powers, rights, or other interests in property included in my gross estate for the purpose of such taxes, shall first be paid out of and charged against my residuary estate. In the event there are insufficient assets in my residuary estate to pay such taxes, then such remaining taxes shall be paid out of and charged equally against the limited partnerships established by me for my children. In the event there are insufficient assets in a limited partnership established by me for a child of mine to pay an equal amount of such remaining taxes, then the child of mine who received or receives an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of an equal amount of any such remaining taxes. * * *

\* \* \* \* \* \* \*

(4)  Specific Bequests.  I hereby make the following specific bequests:

(a)  I give, devise and bequeath all of my tangible personal effects * * * to my children * * *.

(b)  If my wife * * * survives me, I give, devise and bequeath any interest that I may own at the time of my death in the EUGENE E. STONE, III LIMITED PARTNERSHIP, or its successor, and any proceeds, net of taxes, received by my estate from any individual retirement account or deferred compensation * * * to be held in the ALLENE WYMAN STONE TRUST * * *.  If my wife * * * does not survive me, then I give, devise and bequeath any interest that I may own at the time of my death in * * * [ES3LP] to my children * * *.

(c)  I give, devise and bequeath any interest that I may own at the time of my death in the C. RIVERS STONE LIMITED PARTNERSHIP, or its successor, to my son, C. RIVERS STONE, if he survives me, to be his absolutely, but if he does not survive me, to my said son's

estate.

(d)  I give, devise and bequeath any interest that I may own at the time of my death in the E.E. STONE, IV LIMITED PARTNERSHIP, or its successor, to my son, E.E. STONE, IV, if he survives me, to be his absolutely, but if he does not survive me, to my said son's estate.

(e)  I give, devise and bequeath any interest that I may own at the time of my death in the MARY STONE FRASER LIMITED PARTNERSHIP, or its successor, to my daughter, MARY S. FRASER, if she survives me, to be hers absolutely, but if she does not survive me, to my said daughter's estate.

(f)  I give, devise and bequeath any interest that I may own at the time of my death in the ROSALIE STONE MORRIS LIMITED PARTNERSHIP, or its successor, to my daughter, ROSALIE S. MORRIS, if she survives me, to be hers absolutely, but if she does not survive me, to my said daughter's estate.

*      *      *      *      *      *      *

(5)  <u>Allene Wyman Stone Trust</u>.  THE ALLENE WYMAN STONE TRUST shall be held, managed, invested and rein- vested, administered and distributed upon the following terms and conditions and for the following uses and purposes:

(a)  If my wife * * * survives me, then * * * my Trustee shall pay all of the net income from this trust, at least quarterly, to or for the benefit of my wife * * * for and during the term of her life. * * *

(b)  Upon the death of my wife * * * the remaining principal of this trust shall be distributed to my children. * * *

(c)  My Personal Representative shall, in its discretion, determine whether to elect under Section 2056(b)(7) of the Internal Revenue Code * * * to qualify any specific portion or all of this trust for the estate tax marital deduction. * * *

*      *      *      *      *      *      *

(e)   * * * It is my intention that my wife under the provisions of this trust have substantially that degree of beneficial enjoyment of this trust during her lifetime which the principles of the law of trusts accord to a person who is unqualifiedly designated as the life beneficiary of a trust, and my Trustee shall not exercise its discretion in a manner which is not in accord with this expressed intention.  It is also my intention that my Trustee shall invest this trust so that it will produce for my wife during her lifetime an income which is consistent with the value of the trust property and with its preservation.  Therefore, non-income producing property shall not be held as a part of this trust for more than a reasonable period of time without the approval of my wife.  In addition, my wife may require my Trustee at any time to either make any nonproductive property of this trust productive or to convert such nonproductive property to productive property within a reasonable period of time.  It is expressly provided that my Trustee shall not in the exercise of its discretion make any determination inconsistent with the foregoing.

*          *          *          *          *          *          *

(8)  Powers of * * * Trustee.  In addition to such powers as my * * * Trustee may have by law, I authorize each of them, in their discretion, to exercise the following powers, which at all times shall be exercised in a fiduciary capacity for the benefit of the beneficiaries herein: * * * to sell, exchange, grant options and dispose of said property, real, personal, tangible or intangible at such prices and on such terms as they deem proper; * * * to invest and reinvest in any kind of property, real, personal, tangible or intangible, including, but not limited to, common trust funds, stocks, options, futures, contracts, rights, warrants, puts, calls, bonds, notes, mortgages, general or limited partnership interests, limited liability companies, savings accounts and certificates of deposit, and similar liquid funds, mutual funds, real estate, and stock of any corporate fiduciary serving hereunder or

the holding company of such corporate fiduciary; * * * to make distributions in cash or in kind, * * * to continue and operate any business owned by me at my death in the form either of a sole proprietorship, partnership, limited liability company or corporation, and to do any and all things deemed needful or appropriate by my * * * Trustee, including the power to incorporate or form the business and to put additional capital into the business, for such time as they shall deem advisable, without liability for loss resulting from the continuance or operation of the business except for their own negligence; * * * and to do all other acts which in their discretion may be necessary or appropriate for the proper and advantageous management, investment and distribution of my estate or any trust hereunder, all of which may be done without order of or application to any court.  Notwithstanding any provision in this will to the contrary, any duty or power granted to my * * * Trustee shall be absolutely void to the extent that the right to perform such duty, or to exercise such power, or the performance or exercise thereof would in any way cause my estate to lose all or any part of the tax benefits afforded by the marital deduction or any exemption allowed pursuant to the generation-skipping transfer tax provisions under either federal or state laws * * *.

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

　　　(15)  * * * <u>Trustee</u>.  * * * I * * * nominate, constitute and appoint my children * * * as Co-Trustees of all trusts created in this will. * * *

On May 3, 1997, Ms. Stone executed her last will and testament (Ms. Stone's will).  Ms. Stone's will provided as follows:

　　　I, ALLENE WYMAN STONE, a resident of and domiciled in Greenville County, South Carolina, do hereby make, publish and declare this writing to be and contain my Last Will and Testament, hereby revoking any and all other Wills or Codicils to Wills at any time heretofore made by me.

## **ITEM I**

　　　I direct that all of my just debts, secured and unsecured, be paid as soon as practicable after my

death; however, I direct that my Personal Representative may cause any debt to be carried, renewed and refinanced from time to time upon such terms and with such securities for its repayment as my Personal Representative may deem advisable taking into consideration the best interest of the beneficiaries hereunder.

## ITEM II

I direct that all estate, inheritance, succession, death or similar taxes (except generation-skipping transfer taxes) assessed with respect to my estate herein disposed of, or any part thereof, or on any bequest or devise contained in this my Last Will and Testament (which term wherever used herein shall include any codicil hereto), or on any insurance upon my life or on any property held jointly by me with another or on any transfer made by me during my lifetime or on any other property or interest in property included in my estate shall be paid out of my residuary estate and shall not be charged against the marital deduction.  In the event there are insufficient assets in my residuary estate which are not selected for the marital deduction to my estate taxes, then my Personal Representative may charge any such remaining tax payments against the marital deduction.  Notwithstanding the foregoing, if any such tax (including any interest or penalties thereon) is imposed on property includible in my gross estate by reason of Section 2044 of the Internal Revenue Code, as amended, or corresponding provision of state law, I direct my Personal Representative to recover such tax as provided in Section 2207A of the Internal Revenue Code, as amended, or corresponding provision of state law.

## ITEM III

*       *       *       *       *       *       *

* * * I give and devise all of my tangible personal effects and household effects of every kind * * * to my children * * *, in equal shares * * *.

*       *       *       *       *       *       *

## ITEM IV

If my husband * * * survives me, I give, devise

and bequeath any interest that I may own at the time of my death in * * * [ES3LP] to be held in trust pursuant to the terms of Item V of this Will.  If my husband * * * does not survive me, then I give, devise and bequeath any interest that I may own at the time of my death in * * * [ES3LP] * * * to my children * * *, in equal shares * * *.

    *       *       *       *       *       *       *

### ITEM VI

I give, devise and bequeath all the rest, residue and remainder of my property of every kind and description * * * to my children * * *.

On June 14, 1997, Ms. Stone executed a first codicil to Ms. Stone's will (Ms. Stone's codicil).  Ms. Stone's codicil deleted Item II and Item IV of Ms. Stone's will and replaced them with the following new Item II and Item IV:

### ITEM II

I direct that all estate, inheritance, transfer, succession, death, or similar taxes, including any interest or penalties thereon, payable by reason of my death, or assessed or imposed with respect to my estate, or any part thereof, whether or not passing under this Will, or any codicil thereto, shall be paid as follows:

       (a)   Except as provided * * * below, I direct that all estate, generation-skipping transfer, inheritance, transfer, succession, death, or similar taxes which may be assessed or imposed upon or with respect to any interest in a limited partnership established for a child of mine which is included in my gross estate for the purpose of such taxes * * * shall be paid out of and charged against such limited partnership.  In the event there are insufficient assets in a limited partnership established for a child of mine to pay such taxes, then the child of mine who received or receives an interest in such limited partner-

ship, or such child's estate, as the case may be, shall be responsible for the payment of any such remaining taxes.

(b)     Except as provided in subparagraph (c) below, I direct that any taxes which may be assessed or imposed by Section 2035(c) of the Internal Revenue Code, as amended, or corresponding provision of state law, including any interest or penalties thereon, as a result of any gift tax paid or payable with respect to any interest in any limited partnerships established for my children which were the subject of any gifts made by me during my lifetime, shall be paid out of and charged equally against such limited partnerships.  In the event there are insufficient assets in a limited partnership established for a child of mine to pay an equal amount of such taxes, then the child of mine who received a gift of an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of an equal amount of any such remaining taxes.

(c)     In the event the Internal Revenue Service or any other taxing authority changes the value attributable to (i) any assets I have contributed to a limited partnership established for a child of mine * * * then I direct that all gift, estate, generation-skipping transfer, inheritance, transfer, succession, death or similar taxes which may be assessed or imposed as a result of such change in value, * * * shall be paid out of and charged against the limited partnership that received such contribution, or was the subject of such gift, as the case may be.  In the event there are insufficient assets in a limited partnership established for a child of mine to pay such taxes, then the child of mine who received such gift, or whose limited partnership received such contribution, or such child's estate, as the case may be, shall be responsible for the payment of any such remaining taxes.

(d)     I direct that all other estate, generation-

skipping transfer, inheritance, transfer, succession, death, or similar taxes, including any interest or penalties thereon, payable by reason of my death * * * or assessed or imposed with respect to my estate, or any part thereof, whether or not passing under this Will, or any codicil thereto, including all policies of insurance on my life, all bequests and devises, all transfers made by me during my lifetime, all jointly held property, all pension and profit-sharing benefits, deferred compensation benefits and individual retirement accounts, and all powers, rights, or other interests in property included in my gross estate for the purpose of such taxes, shall first be paid out of and charged against my residuary estate. In the event there are insufficient assets in my residuary estate to pay such taxes, then such remaining taxes shall be paid out of and charged equally against the limited partnerships established for my children. In the event there are insufficient assets in a limited partnership established for a child of mine to pay an equal amount of such remaining taxes, then the child of mine who received or receives an interest in such limited partnership, or such child's estate, as the case may be, shall be responsible for the payment of an equal amount of any such remaining taxes. * * *

## ITEM IV

I hereby make the following specific bequests:

(a) I give, devise and bequeath any interest that I may own at the time of my death in the EUGENE E. STONE, III LIMITED PARTNERSHIP, or its successor, to my children * * * in equal shares * * *.

(b) I give, devise and bequeath any interest that I may own at the time of my death in the C. RIVERS STONE LIMITED PARTNERSHIP, or its successor, to my son, C. RIVERS STONE, if he survives me, to be his absolutely, but if he does not survive me, to my said son's estate.

(c)  I give, devise and bequeath any interest that I may own at the time of my death in the E.E. STONE, IV LIMITED PARTNERSHIP, or its successor, to my son, E.E. STONE, IV, if he survives me, to be his absolutely, but if he does not survive me, to my said son's estate.

(d)  I give, devise and bequeath any interest that I may own at the time of my death in the MARY STONE FRASER LIMITED PARTNERSHIP, or its successor, to my daughter, MARY S. FRASER, if she survives me, to be hers absolutely, but if she does not survive me, to my said daughter's estate.

(e)  I give, devise and bequeath any interest that I may own at the time of my death in the ROSALIE STONE MORRIS LIMITED PARTNERSHIP, or its successor, to my daughter, ROSALIE S. MORRIS, if she survives me, to be hers absolutely, but if she does not survive me, to my said daughter's estate.

On April 8, 1997, Mr. Stone gave to each of the children an undivided .25-percent interest in the Cherrydale residence.  On April 8, 1997, Mr. Stone gave to Eugene Earle Stone, IV, an undivided one-percent interest in 11.603 acres of land located on Keith Drive, in Greenville County, South Carolina (Keith Drive property).  On April 8, 1997, Mr. Stone gave to C. Rivers Stone an undivided one-percent interest in each of various parcels totaling 366.097 acres of the Piney Mountain property.  On April 8, 1997, Mr. Stone gave to Ms. Morris an undivided one-percent interest in a 4.263-acre parcel and an undivided one-percent interest in a .333-acre parcel of the Piney Mountain property.  On April 8, 1997, Mr. and Ms. Stone gave to Ms. Fraser, an

undivided one-percent interest in the 1054.415-acre parcel of the Cedar Mountain property.

Around the middle of September 1998, Mr. Stone's estate filed on behalf of the deceased Mr. Stone Form 709, United States Gift (& Generation-Skipping Transfer) Tax Return, for the taxable year 1997 (1997 gift tax return), in which the above-described gifts, as well as certain other gifts including those discussed below, were reported.

In April 1997, the partners of ES3LP made bona fide, arm's-length transfers to that partnership, as follows. On April 9, 1997, Mr. Stone transferred to ES3LP the interest that he owned in the Cherrydale residence and certain other property in exchange for both general and limited partnership interests, and the children transferred to ES3LP the respective interests that they owned in the Cherrydale residence in exchange for general partnership interests.[27] At a time not disclosed by the record in April 1997, Ms. Stone transferred certain property that she owned to ES3LP in exchange for a limited partnership interest. When the partners of ES3LP formed and funded that partnership, they contemplated and intended that ES3LP operate as a joint enterprise for profit for the management of its assets and that the children contribute their services in providing such manage-

---

[27]Although not altogether clear from the record, it appears that each of the children also transferred certain other property to ES3LP in exchange for a general partnership interest.

ment.

Neither Mr. Stone nor Ms. Stone intended to, or did, live at the Cherrydale residence after Mr. Stone and the children transferred their respective interests in that residence to ES3LP. If Mr. Stone or Ms. Stone had desired to live at the Cherrydale residence after Mr. Stone and the children transferred their respective interests in the Cherrydale residence to ES3LP, the children, as the other partners of ES3LP, would not have objected, provided that Mr. Stone or Ms. Stone, as the case may be, used personal funds to pay rent to ES3LP.

After the partners of ES3LP transferred the respective assets that they owned to ES3LP in exchange for certain partnership interests, the children actively managed the assets of ES3LP, as Mr. and Ms. Stone intended. In this connection, during 1998, after renovation of the Cherrydale residence was completed in the fall of 1997, ES3LP rented it to, and received rental income from, Stone Manufacturing, which used that residence to house a management team that it decided to retain in order to assist the Company in addressing certain economic difficulties that it was having.[28] In addition, the respective partnership

---

[28]In Form 1065, U.S. Partnership Return of Income (partnership return), that ES3LP filed for 1998, ES3LP reported gross rents of $34,650 from Stone Manufacturing for the rental of the Cherrydale residence. Neither before nor after Mr. Stone and the children transferred their respective interests in the Cherrydale residence to ES3LP did Mr. Stone or Ms. Stone report any rental
(continued...)

returns that ES3LP filed for 1998 and 1999 reflected that ES3LP
made investment decisions to sell some of its assets, including
certain stock that it purchased on May 7, 1997, and that it sold
approximately two years later for a substantial gain.[29]  ES3LP
also hired advisors and accountants who at all times were differ-
ent from those of ES4LP, CRSLP, RSMLP, and MSFLP.  At no time did
the partners of ES3LP, including Mr. Stone and Ms. Stone, commin-
gle the assets that ES3LP owned with their respective personal
assets.  At all times, ES3LP was respected by the Stone family as
a separate entity.

In April 1997, the partners of ES4LP made bona fide, arm's-
length transfers to that partnership, as follows.  On April 9,

---

[28](...continued)
income from that residence in any Federal income tax return.  In
Form 1040, U.S. Individual Income Tax Return (Form 1040), that
Mr. and Ms. Stone filed jointly for their taxable year 1995 (1995
joint return), they reported "Rents received" from "various"
rental properties totaling $92,798.  The depreciation schedules
attached to the 1995 joint return identify those "various" rental
properties as properties other than the Cherrydale residence.  In
Mr. and Ms. Stone's joint returns for their taxable years 1996
(1996 joint return) and 1997 (1997 joint return), they reported
"Rents received" from "various" rental properties totaling
$99,435 and $34,440, respectively.  The respective depreciation
schedules attached to the 1996 joint return and the 1997 joint
return identify those "various" rental properties as properties
other than the Cherrydale residence and as the same properties
from which Mr. and Ms. Stone reported rents in the 1995 joint
return.  In Form 1040 that Ms. Stone filed for the taxable year
1998 (Ms. Stone's 1998 return), Ms. Stone did not report any
rental income.

[29]Although not altogether clear from the record, it appears
that ES3LP reinvested the proceeds from the sale of its assets.

1997, Mr. Stone transferred to ES4LP some of his preferred stock of Stones, Inc., his interest in the Keith Drive property, and certain other property, and Eugene Earle Stone, IV, transferred to ES4LP his interest in the Keith Drive property, in exchange for both general and limited partnership interests.[30]  At a time not disclosed by the record in April 1997, Anne M. Stone transferred certain property that she owned to ES4LP in exchange for a general partnership interest.  On April 15, 1997, Ms. Stone transferred certain property that she owned to ES4LP in exchange for a limited partnership interest.  When the partners of ES4LP formed and funded that partnership, they contemplated and intended that ES4LP operate as a joint enterprise for profit for the management of its assets and that Eugene Earle Stone, IV, contribute his services in providing such management.

After the partners of ES4LP transferred the respective assets that they owned to ES4LP in exchange for certain partnership interests, Eugene Earle Stone, IV, began actively managing the assets of ES4LP, as Mr. and Ms. Stone intended.   In this connection, Eugene Earle Stone, IV, on behalf of ES4LP, managed, and made investment decisions with respect to, ES4LP's assets.  The respective partnership returns that ES4LP filed for

---

[30]Although not altogether clear from the record, it appears that Eugene Earle Stone, IV, also transferred certain other property to ES4LP in exchange for general and limited partnership interests.

1997 and 1999 reflected that ES4LP sold certain of its stock for substantial gains.[31]  Eugene Earle Stone, IV, also hired on behalf of ES4LP advisors and accountants who at all times were different from those of ES3LP, CRSLP, RSMLP, and MSFLP.  At no time did the partners of ES4LP, including Mr. Stone and Ms. Stone, commingle the assets that ES4LP owned with their respective personal assets.  At all times, ES4LP was respected by the Stone family as a separate entity.

In April 1997, the partners of CRSLP made bona fide, arm's-length transfers to that partnership, as follows.  On April 9, 1997, Mr. Stone transferred to CRSLP his interest in each of various parcels totaling 366.097 acres of the Piney Mountain property and certain other property, and C. Rivers Stone transferred to CRSLP his interest in each of those parcels, in exchange for both general and limited partnership interests.[32]  At a time not disclosed by the record in April 1997, Charles R. Stone, Jr., transferred certain property that he owned to CRSLP in exchange for both limited and general partnership interests, and Frances O. Stone transferred certain property that she owned to CRSLP in exchange for a limited partnership interest.  On

[31]Although not altogether clear from the record, it appears that ES4LP reinvested the proceeds from the sale of its stock in 1997 and 1999 in certain real estate.

[32]Although not altogether clear from the record, it appears that C. Rivers Stone also transferred certain other property to CRSLP in exchange for general and limited partnership interests.

April 15, 1997, Ms. Stone transferred property that she owned to CRSLP in exchange for a limited partnership interest. When the partners of CRSLP formed and funded that partnership, they contemplated and intended that CRSLP operate as a joint enterprise for profit for the management of its assets and that C. Rivers Stone contribute his services in providing such management.

After the partners of CRSLP transferred the respective assets that they owned to CRSLP in exchange for certain partnership interests, C. Rivers Stone began actively managing the assets of CRSLP, as Mr. and Ms. Stone intended. In this connection, C. Rivers Stone, on behalf of CRSLP, began a major project to convert CRSLP's Piney Mountain property into a high-end real property development which was to be known as Montebello and which was to consist of over 1,000 houses, with, inter alia, clubhouses for meetings and weddings, as well as shopping centers. In addition, the partnership return that CRSLP filed for 1997 reflected that CRSLP made investment decisions to sell certain of its stock for a substantial gain.[33] Moreover, the respective partnership returns that CRSLP filed for 1997, 1998, and 1999 reflected that CRSLP rented various real properties that it owned (other than the Piney Mountain property) from which it

[33]Although not altogether clear from the record, it appears that CRSLP reinvested the proceeds from the sale of its stock in, inter alia, certain real estate.

received and reported rental income.  C. Rivers Stone also hired on behalf of CRSLP advisors and accountants who at all times were different from those of ES3LP, ES4LP, RSMLP, and MSFLP.  At no time did the partners of CRSLP, including Mr. Stone and Ms. Stone, commingle the assets that CRSLP owned with their respective personal assets.  At all times, CRSLP was respected by the Stone family as a separate entity.

In April 1997, the partners of RSMLP made bona fide, arm's-length transfers to that partnership, as follows.  On April 9, 1997, Mr. Stone transferred to RSMLP certain of his stock and securities, including some of his preferred stock of Stones, Inc., his interest in the 4.263-acre parcel and the .333-acre parcel of the Piney Mountain property, and certain other property, and Ms. Morris transferred to RSMLP her interest in each of those parcels, in exchange for both general and limited partnership interests.[34]  At a time not disclosed by the record in April 1997, Mr. Morris transferred certain property that he owned to RSMLP in exchange for a general partnership interest, and Charles H. Morris, Jr., and Rosalie S. Morris, II, transferred certain property that they owned to RSMLP in exchange for limited partnership interests.  On April 15, 1997, Ms. Stone transferred certain property, including certain of her stock and securities,

---

[34]Although not altogether clear from the record, it appears that Ms. Morris also transferred certain other property to RSMLP in exchange for general and limited partnership interests.

that she owned to RSMLP in exchange for a limited partnership interest. When the partners of RSMLP formed and funded that partnership, they contemplated and intended that RSMLP operate as a joint enterprise for profit for the management of its assets and that Ms. Morris contribute her services in providing such management.

After the partners of RSMLP transferred the respective assets that they owned to RSMLP in exchange for certain partnership interests, Ms. Morris began actively managing the assets of RSMLP, as Mr. and Ms. Stone intended. In this connection, Ms. Morris, on behalf of RSMLP, began actively managing its real estate holdings. She also transferred certain of RSMLP's securities from a brokerage account that it had in Greenville, South Carolina, to a brokerage account that she opened for it in Savannah, Georgia, where she was living. In addition, the respective partnership returns that RSMLP filed for 1997, 1998, and 1999 reflected that RSMLP made investment decisions to sell certain of its stock for substantial gains.[35] Those partnership returns also reflected that RSMLP rented certain of its real property from which it received and reported rental income. Ms. Morris also hired on behalf of RSMLP advisors and accountants who at all times were different from those of ES3LP, ES4LP, CRSLP,

_____

[35]Although not altogether clear from the record, it appears that RSMLP reinvested the proceeds from the sale of its stock.

and MSFLP.  At no time did the partners of RSMLP, including Mr. Stone and Ms. Stone, commingle the assets that RSMLP owned with their respective personal assets.  At all times, RSMLP was respected by the Stone family as a separate entity.

In April 1997, the partners of MSFLP made bona fide, arm's-length transfers to that partnership, as follows.  On April 9, 1997, Mr. Stone transferred to MSFLP his interest in the 1054.415-acre parcel of the Cedar Mountain property and certain other property, and Ms. Fraser transferred to MSFLP her interest in that property,[36] in exchange for both general and limited partnership interests.[37]  On the same date, Ms. Stone transferred to MSFLP the interest that she owned in the 1054.415-acre parcel of the Cedar Mountain property in exchange for a limited partnership interest.  At a time not disclosed by the record in April 1997, Ms. Davis and Ms. Arnal transferred certain property that they owned to MSFLP in exchange for both general and limited

---

[36]The record is not clear as to why the deed reflecting the transfer to MSFLP of Ms. Fraser's interest in the 1054.415-acre parcel of the Cedar Mountain property showed Ms. Fraser and her husband Mr. Fraser as the grantors, while the deed reflecting the transfer by Mr. Stone and Ms. Stone to Ms. Fraser of such interest in that parcel showed the grantee only as Ms. Fraser.  We presume that applicable State law required that not only Ms. Fraser but also her husband Mr. Fraser be reflected as grantors on the deed when Ms. Fraser transferred to MSFLP her interest in the 1054.415-acre parcel of the Cedar Mountain property.

[37]Although not altogether clear from the record, it appears that Ms. Fraser also transferred certain other property to MSFLP in exchange for general and limited partnership interests.

partnership interests.  When the partners of MSFLP formed and funded that partnership, they contemplated and intended that MSFLP operate as a joint enterprise for profit for the management of its assets and that Ms. Fraser contribute her services in providing such management.

After the partners of MSFLP transferred the respective assets that they owned to MSFLP in exchange for certain partnership interests, Ms. Fraser began actively managing the assets of MSFLP, as Mr. and Ms. Stone intended.  In this connection, Ms. Fraser, on behalf of MSFLP, began actively managing MSFLP's Cedar Mountain property, which included maintaining the roads and lakes that Mr. Stone had built on that property.  In addition, the respective partnership returns that MSFLP filed for 1998 and 1999 reflected that MSFLP made investment decisions to sell certain of its stock for substantial gains.[38]  Ms. Fraser also hired on behalf of MSFLP advisors and accountants who at all times were different from those of ES3LP, ES4LP, CRSLP, and RSMLP.  At no time did the partners of MSFLP, including Mr. Stone and Ms. Stone, commingle the assets that MSFLP owned with their respective personal assets.  At all times, MSFLP was respected by the Stone family as a separate entity.

The respective assets that Mr. Stone and Ms. Stone retained,

---

[38]Although not altogether clear from the record, it appears that MSFLP reinvested the proceeds from the sale of its stock.

and did not transfer in April 1997 to each of the Five Partner-
ships, were sufficient to maintain their respective accustomed
standards of living. Mr. and Ms. Stone did not transfer to any
of the Five Partnerships the 582.672-acre parcel of the Cedar
Mountain property on which Mr. Stone was living in April 1997.[39]
Ms. Stone did not transfer to any of the Five Partnerships the
Cypress villa on Hilton Head Island in which she was living in
April 1997.

Sometime after the respective bona fide, arm's-length
transfers of assets in April 1997 to each of ES4LP, CRSLP, RSMLP,
and MSFLP in exchange for partnership interests, the Stone family
realized that there had been an inadvertent, improper valuation
of certain of such assets (valuation errors). Those valuation
errors resulted in each of the children's having received a total
partnership interest in each such partnership in which such child
had a partnership interest that was larger (unintended excessive
partnership interest) than the Stone family intended and agreed
each should have received had the correct valuation been used.
The Stone family did not intend or agree that a partner of any of
ES4LP, CRSLP, RSMLP, and MSFLP (or ES3LP) was to receive a larger

---

[39]On Apr. 8, 1997, Mr. and Ms. Stone gave to Anne Logan
Ministries, Inc., a charity, the remainder interest in the
582.672-acre parcel of the Cedar Mountain property on which Mr.
Stone was living, and Mr. Stone retained a life estate in that
parcel. When Mr. Stone died, he had an ownership interest only
in the .338-acre parcel of the Cedar Mountain property.

total partnership interest in each such partnership than such partner should have received based on the value of the property that such partner transferred to any such partnership. In order to correct the unintended consequences of the valuation errors, Mr. Stone made a gift as of April 9, 1997, to each of the children of the unintended excessive partnership interest in each of ES4LP, CRSLP, RSMLP, and MSFLP that each such child had received, as follows:

| Donee's Name | Description of Gift | Value of Gift |
|---|---|---|
| Eugene Earle Stone, IV | 281 General Partner Units in ES4LP | $10,095 |
| Eugene Earle Stone, IV | 1 Limited Partner Unit in ES4LP | 36 |
| C. Rivers Stone | 1.02 General Partner Units in CRSLP | 50 |
| Ms. Morris | 136 General Partner Units in RSMLP | 6,426 |
| Ms. Morris | 1 Limited Partner Unit in RSMLP | 47 |
| Ms. Fraser | 34 General Partner Units in MSFLP | 1,489 |
| Ms. Fraser | 1 Limited Partner Unit in MSFLP | 44 |
| Total Value of Gifts | | $18,187 |

After the foregoing gifts were made as of April 9, 1997,[40] all the partners of each of the Five Partnerships received, as the Stone family intended and agreed, respective percentage interests in each such partnership that were proportionate to the

---

[40]The above-described gifts were reported in the 1997 gift tax return filed on behalf of the deceased Mr. Stone.

fair market value of the assets that such partners respectively transferred to each such partnership, and the respective assets that the partners of each such partnership transferred to each such partnership were credited to the respective capital accounts of such partners. Upon the termination or dissolution of each of the Five Partnerships, the partners of each such partnership were entitled to distributions from each such partnership in amounts equal to their respective capital accounts.

After the partners of ES3LP made bona fide, arm's-length transfers of the respective assets that they owned to that partnership in exchange for certain partnership interests, the respective partnership interests owned by the partners of ES3LP in April 1997 were as follows:

| Partner | General Partner Interests | Limited Partner Interests |
|---|---|---|
| Mr. Stone | 1.001% | 68.972% |
| Ms. Stone | -- | 29.027% |
| Eugene Earle Stone, IV | .250% | -- |
| C. Rivers Stone | .250% | -- |
| Ms. Morris | .250% | -- |
| Ms. Fraser | .250% | -- |

At the time of Mr. Stone's death on June 5, 1997, Mr. Stone held the same percentage partnership interests in ES3LP that he owned in April 1997. At the time of Ms. Stone's death on October 16, 1998, Ms. Stone held the same percentage partnership interest in ES3LP that she owned in April 1997.

After the partners of ES4LP made bona fide, arm's-length transfers of the respective assets that they owned to that partnership in exchange for certain partnership interests, the respective partnership interests owned by the partners of ES4LP in April 1997 were as follows:

| Partner | General Partner Interests | Limited Partner Interests |
|---|---|---|
| Mr. Stone | 1.003% | 93.874% |
| Ms. Stone | -- | 4.120% |
| Eugene Earle Stone, IV | 1.000% | .001% |
| Anne M. Stone | .002% | -- |

At the time of Mr. Stone's death on June 5, 1997, Mr. Stone held the same percentage partnership interests in ES4LP that he owned in April 1997. At the time of Ms. Stone's death on October 16, 1998, Ms. Stone held the same partnership interest in ES4LP that she owned in April 1997.

After the partners of CRSLP made bona fide, arm's-length transfers of the respective assets that they owned to that partnership in exchange for certain partnership interests, the respective partnership interests owned by the partners of CRSLP in April 1997 were as follows:

| Partner | General Partner Interests | Limited Partner Interests |
|---|---|---|
| Mr. Stone | 1.002% | 97.483% |
| Ms. Stone | -- | .510% |
| C. Rivers Stone | 1.000% | .001% |
| Charles R. Stone, Jr. | .001% | .001% |
| Frances O. Stone | -- | .002% |

At the time of Mr. Stone's death on June 5, 1997, Mr. Stone held the same percentage partnership interests in CRSLP that he owned in April 1997. At the time of Ms. Stone's death on October 16, 1998, Ms. Stone held the same partnership interest in CRSLP that she owned in April 1997.

After the partners of RSMLP made bona fide, arm's-length transfers of the respective assets that they owned to that partnership in exchange for certain partnership interests, the respective partnership interests owned by the partners of RSMLP in April 1997 were as follows:

| Partner | General Partner Interests | Limited Partner Interests |
|---|---|---|
| Mr. Stone | 1.003% | 94.29725% |
| Ms. Stone | -- | 3.6935% |
| Ms. Morris | 1.000% | .001% |
| Mr. Morris | .00175% | -- |
| Charles H. Morris, Jr. | -- | .00175% |
| Rosalie S. Morris, II | -- | .00175% |

At the time of Mr. Stone's death on June 5, 1997, Mr. Stone held the same percentage partnership interests in RSMLP that he owned in April 1997. At the time of Ms. Stone's death on October 16, 1998, Ms. Stone held the same partnership interest in RSMLP that she owned in April 1997.

After the partners of MSFLP made bona fide, arm's-length transfers of the respective assets that they owned to that partnership in exchange for certain partnership interests, the

respective partnership interests owned by the partners of MSFLP

in April 1997 were as follows:

| Partner | General Partner Interests | Limited Partner Interests |
|---------|---------------------------|---------------------------|
| Mr. Stone | 1.003% | 90.141% |
| Ms. Stone | -- | 7.851% |
| Ms. Fraser | 1.000% | .001% |
| Ms. Davis | .001% | .001% |
| Ms. Arnal | .001% | .001% |

At the time of Mr. Stone's death on June 5, 1997, Mr. Stone

held the same percentage partnership interests in MSFLP that he

owned in April 1997.  At the time of Ms. Stone's death on October

16, 1998, Ms. Stone held the same partnership interest in MSFLP

that she owned in April 1997.

On June 5, 1997, Mr. Stone died at the age of 89.  On that

date, pursuant to Mr. Stone's will, The Allene Wyman Stone Trust

(AWS Trust) was formed.  Pursuant to that will, (1) the 1.001

percent general partnership interest and the 68.972 percent

limited partnership interest in ES3LP that Mr. Stone held on the

date of his death, (2) all the assets on that date in his indi-

vidual retirement account (Mr. Stone's retirement account),[41] and

(3) his right on that date to certain deferred compensation from

Stone Manufacturing were transferred to that trust.  (We shall

sometimes refer to the assets in Mr. Stone's retirement account

---

[41]On the date of Mr. Stone's death, the assets in Mr. Stone's retirement account consisted of numerous corporate stocks and securities and a Government bond.

and his right to certain deferred compensation from Stone Manufacturing as certain other property.) Ms. Stone did not transfer any property to ES3LP in exchange for the general and limited partnership interests in ES3LP held by the AWS Trust as of June 5, 1997, the date of Mr. Stone's death.[42]

On August 5, 1997, after Mr. Stone died, Ms. Morris, and Mr. Morris, as general partners, filed a first amendment to the certificate of limited partnership for RSMLP with the S.C. Secretary of State. The purpose of that amendment was to remove Mr. Stone as a general partner of RSMLP.

On August 5, 1997, after Mr. Stone died, Ms. Fraser, Ms. Davis, and Ms. Arnal, as general partners, filed a first amendment to the certificate of limited partnership for MSFLP with the S.C. Secretary of State. The purpose of that amendment was to remove Mr. Stone as a general partner of MSFLP.

On August 7, 1997, after Mr. Stone died, C. Rivers Stone, and Charles Rivers Stone, Jr., as general partners, filed a first amendment to the certificate of limited partnership for CRSLP with the S.C. Secretary of State. The purpose of that amendment was to remove Mr. Stone as a general partner of CRSLP.[43]

---

[42]As discussed above, it was Mr. Stone who transferred certain property to ES3LP in exchange for the general and limited partnership interests that, pursuant to his will, were transferred to the AWS Trust.

[43]On Oct. 1, 1998, C. Rivers Stone, as a general partner,
(continued...)

On October 1, 1997, after Mr. Stone died, Eugene Earle Stone, IV, and Anne M. Stone, as general partners, filed a first amendment to the certificate of limited partnership for ES4LP with the S.C. Secretary of State. The purpose of that amendment was to remove Mr. Stone as a general partner of ES4LP.

On January 8, 1998, after Mr. Stone died, Eugene Earle Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser, as general partners, filed a second amendment to the certificate of limited partnership for ES3LP with the S.C. Secretary of State. The purpose of that amendment was to remove Mr. Stone as a general partner of ES3LP.

After Mr. Stone's death, all the respective partners of each of ES4LP, CRSLP, RSMLP, and MSFLP agreed to make a distribution from each such partnership in order to pay the portion of the Federal estate tax and any applicable State estate tax (State estate tax) (collectively, Federal and State estate taxes) with respect to Mr. Stone's estate that was attributable to the inclusion in that estate of the total partnership interest in each such partnership held by Mr. Stone on the date of his death. After Mr. Stone's death, the partners of ES3LP did not agree to,

---

[43](...continued) filed a second amendment to the certificate of limited partnership for CRSLP with the S.C. Secretary of State. The purpose of that amendment was to remove Charles Rivers Stone, Jr., as a general partner of CRSLP. The record does not disclose why Charles Rivers Stone, Jr., withdrew as a general partner of CRSLP.

and did not, make any distributions from that partnership to pay any Federal and State estate taxes with respect to Mr. Stone's estate.[44]

At a time not disclosed by the record after Mr. Stone's death, Ernst & Young, LLP (E&Y), prepared a document entitled "Estate of E.E. Stone, III Allocation of Estate Tax" (E&Y's Estate tax allocation schedule). That document showed for each of ES4LP, CRSLP, RSMLP, and MSFLP the amount of Federal and State estate taxes that each such partnership was to pay in 1998 and

---

[44]None of the Federal and State estate taxes with respect to Mr. Stone's estate was attributable to Mr. Stone's total 69.973 percent partnership interest in ES3LP. As discussed above, that partnership interest was transferred along with certain other property to the AWS Trust with respect to which, as discussed below, an election under sec. 2056(b)(7) was made.

Because of Mr. Stone's death in 1997, in that year, as reflected in the partnership return that ES3LP filed for 1997, ES3LP opened a capital account for his estate (Mr. Stone's estate's capital account in ES3LP), and the balances in Mr. Stone's capital account in ES3LP as a general partner and a limited partner were transferred to Mr. Stone's estate's capital account in ES3LP. The partnership return that ES3LP filed for 1997 reflected that ES3LP did not make distributions during that year to any of its other partners. Because of Ms. Stone's death in 1998, in that year, as reflected in the partnership return that ES3LP filed for 1998, ES3LP opened a capital account for her estate (Ms. Stone's estate's capital account in ES3LP), and the balance in Ms. Stone's capital account in ES3LP as a limited partner was transferred to Ms. Stone's estate's capital account in ES3LP. The partnership return that ES3LP filed for 1998 reflected that ES3LP did not make distributions during that year to any of its other partners. The partnership return that ES3LP filed for 1999 reflected that ES3LP made pro rata distributions during that year to its partners totaling $567,172, as follows: $396,867 to Mr. Stone's estate, $164,633 to Ms. Stone's estate, and $1,418 to each of the children. The record does not disclose the purpose or use of those distributions.

the amount of Federal and State estate taxes and interest that each such partnership was to pay in 1999, which were attributable to the inclusion in Mr. Stone's estate of the total partnership interest in each such partnership held by Mr. Stone on the date of his death. E&Y's Estate tax allocation schedule provided as follows:

|  | ES4LP | CRSLP | RSMLP | MSFLP |
|---|---|---|---|---|
| 1998 Federal estate tax | $496,642.00 | $80,000.00 | $599,333.00 | $461,597.00 |
| 1998 State estate tax | 133,029.00 | 20,000.00 | 160,536.00 | 123,642.00 |
| 1998 TOTAL Federal and State estate taxes | $629,671.00 | $100,000.00 | $759,869.00 | $585,239.00 |
| 1999 Federal estate tax and interest | $371,336.72 | $1,000,641.91 | $571,597.34 | $514,194.67 |
| 1999 State estate tax and interest | 98,545.00 | 268,474.00 | 151,871.00 | 136,704.00 |
| 1999 TOTAL Federal and State estate taxes and interest | $469,881.72 | $1,269,115.91 | $723,468.34 | $650,898.67 |
| GRAND TOTAL | $1,099,552.72 | $1,369,115.91 | $1,483,337.34 | $1,236,137.67 |

On March 5, 1998, the Internal Revenue Service (IRS) received a total of $1,698,074 in payments for the anticipated estate tax with respect to Mr. Stone's estate. Those payments consisted of a $60,502 check drawn on the bank account of Mr. Stone's estate,[45] a $496,642 check drawn on ES4LP's bank account,

_____

[45]The estate tax of $60,502 paid by Mr. Stone's estate was attributable to the inclusion in his estate of all the property that he owned on the date of his death except for his properties, including his partnership interest in ES3LP, to be held by the
(continued...)

an $80,000 check drawn on CRSLP's bank account, a $599,333 check drawn on RSMLP's bank account, and a $461,597 check drawn on MSFLP's bank account. In 1998, State estate tax totaling $437,207 was paid with respect to Mr. Stone's estate. Of that total amount of State estate tax paid in 1998, ES4LP paid $133,029, CRSLP paid $20,000, RSMLP paid $160,536, and MSFLP paid $123,642.[46] The funds used to pay Federal and State estate taxes in 1998 with respect to Mr. Stone's estate consisted of non pro rata distributions to or on behalf of his estate by each of ES4LP, CRSLP, RSMLP, and MSFLP.

The partnership return that ES4LP filed for 1998 reflected that ES4LP made distributions during that year to its partners totaling $639,807 (i.e., $639,288 to Mr. Stone's estate, $418 to Ms. Stone, and $101 to Eugene Earle Stone, IV).[47]

---

[45](...continued)
AWS Trust for the benefit of Ms. Stone and except for his respective partnership interests in ES4LP, CRSLP, RSMLP, and MSFLP bequeathed to Eugene Earle Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser, respectively.

[46]The record discloses that ES4LP paid $133,029 to the S.C. Department of Revenue on Mar. 15, 1998. The record does not disclose the date on which CRSLP, RSMLP, and MSFLP made State estate tax payments with respect to Mr. Stone's estate.

[47]The only other distribution reflected in ES4LP's partnership return for 1998 was because of Ms. Stone's death in that year. The partnership return that ES4LP filed for 1998 reflected that ES4LP opened a capital account for Ms. Stone's estate (Ms. Stone's estate's capital account in ES4LP), and the balance in Ms. Stone's capital account as a limited partner was transferred to Ms. Stone's estate's capital account in ES4LP.

(continued...)

ES4LP's balance sheet for 1998 included a schedule entitled "Eugene E. Stone IV Limited Partnership, Transaction Detail by Date, January through December 1998" (ES4LP's 1998 transaction schedule). ES4LP's 1998 transaction schedule reflected a check dated March 15, 1998, payable to the IRS, in the amount of $496,642 and a check dated March 15, 1998, payable to the S.C. Department of Revenue, in the amount of $133,029.[48]

The partnership return that CRSLP filed for 1998 reflected that CRSLP did not make distributions during that year to any of its partners.[49] However, CRSLP's "Trial Balance Worksheet--Ac

---

[47](...continued)
Because of Mr. Stone's death in 1997, in that year, as reflected in the partnership return that ES4LP filed for 1997, ES4LP opened a capital account for his estate (Mr. Stone's estate's capital account in ES4LP), and the balances in Mr. Stone's capital accounts in ES4LP as a general partner and a limited partner were transferred to Mr. Stone's estate's capital account in ES4LP. The partnership return that ES4LP filed for 1997 showed that ES4LP made distributions during that year to Eugene Earle Stone, IV, totaling $8,754 and that, except for the above-discussed transfer to Mr. Stone's estate's capital account in ES4LP, it did not make distributions during that year to any of its other partners.

[48]The $496,642 distribution and the $133,029 distribution on behalf of Mr. Stone's estate shown in ES4LP's 1998 transaction schedule, when totaled, equal the total amount of Federal and State estate taxes with respect to Mr. Stone's estate (i.e., $629,671) that E&Y's Estate tax allocation schedule reflected as payable by ES4LP in 1998.

[49]Although not reflected as a distribution in CRSLP's partnership return for 1998, because of Ms. Stone's death in that year, as reflected in the partnership return that CRSLP filed for 1998, CRSLP opened a capital account for Ms. Stone's estate (Ms. Stone's estate's capital account in CRSLP), and the balance in
(continued...)

counts" for 1998 (CRSLP's 1998 trial balance worksheets) re-
flected the following adjustments to an account identified as "C.
Rivers Stone-Draws": $510, $26,390, $66,721, $6,063, $316, and
$100,000, or a total of $200,000 of adjustments to that account.
CRSLP's 1998 trial balance worksheets included a schedule enti-
tled "C. Rivers Stone LLP '98, Montebello Actual Expenses
(2/9/99)" (CRSLP's 1998 Montebello expense schedule).  CRSLP's
1998 Montebello expense schedule reflected in pertinent part the
following entries:

| Vendor | March 1998 | 1998 Totals |
|---|---|---|
| Estate Taxes | $0 | $0 |
| Estate Taxes:  AW Stone 4 Lots | 510 | 510 |
| Estate Taxes:  Commercial | 26,390 | 26,390 |
| Estate Taxes:  Residential | 66,721 | 66,721 |
| Estate Taxes:  Securities | 6,063 | 6,063 |
| Estate Taxes:  Tulip Street Rental | 316 | 316 |

The foregoing amounts, which total $100,000,[50] are identical to

---

[49](...continued)
Ms. Stone's capital account as a limited partner was transferred
to Ms. Stone's estate's capital account in CRSLP.

   Because of Mr. Stone's death in 1997, in that year, as
reflected in the partnership return that CRSLP filed for 1997,
CRSLP opened a capital account for his estate (Mr. Stone's
estate's capital account in CRSLP), and the balances in Mr.
Stone's capital accounts in CRSLP as a general partner and a
limited partner were transferred to Mr. Stone's estate's capital
account in CRSLP.  The partnership return that CRSLP filed for
1997 showed that CRSLP did not make distributions during that
year to any of its other partners.

   [50]The $100,000 expenditure shown in CRSLP's 1998 Montebello
expense schedule equals the total amount of Federal and State
estate taxes with respect to Mr. Stone's estate that E&Y's Estate
(continued...)

five of the six adjustments to "C. Rivers Stone--Draws" that were reflected in CRSLP's 1998 trial balance worksheets.

The partnership return that RSMLP filed for 1998 reflected that RSMLP made distributions during that year to Mr. Stone's estate of $759,869.[51]

The partnership return that MSFLP filed for 1998 reflected that MSFLP made distributions during that year to its partners totaling $654,239 (i.e., $585,239 to Mr. Stone's estate[52] and

---

[50](...continued)
tax allocation schedule reflected as payable by CRSLP in 1998.

[51]The $759,869 distribution to Mr. Stone's estate shown in RSMLP's 1998 partnership return equals the total amount of Federal and State estate taxes with respect to Mr. Stone's estate that E&Y's Estate tax allocation schedule reflected as payable by RSMLP in 1998.

The only other distribution reflected in RSMLP's partnership return for 1998 was because of Ms. Stone's death in that year. The partnership return that RSMLP filed for 1998 reflected that RSMLP opened a capital account for Ms. Stone's estate (Ms. Stone's estate's capital account in RSMLP), and the balance in Ms. Stone's capital account as a limited partner was transferred to Ms. Stone's estate's capital account in RSMLP.

Because of Mr. Stone's death in 1997, in that year, as reflected in the partnership return that RSMLP filed for 1997, RSMLP opened capital accounts for his estate (Mr. Stone's estate's capital accounts in RSMLP), and the balances in Mr. Stone's capital accounts in RSMLP as a general partner and a limited partner were transferred to Mr. Stone's estate's capital accounts in RSMLP. The partnership return that RSMLP filed for 1997 showed that RSMLP did not make distributions during that year to any of its other partners.

[52]The $585,239 distribution to Mr. Stone's estate shown in MSFLP's 1998 partnership return equals the total amount of Federal and State estate taxes with respect to Mr. Stone's estate
(continued...)

$69,000 to Ms. Fraser).[53]

Financial statements for MSFLP for 1998 (MSFLP's 1998 financial statements) reflected as an expense $585,239[54] of "Estate Taxes".

On September 15, 1998, Mr. Stone's estate filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (Mr. Stone's estate tax return). Mr. Stone's estate tax return reported as part of the value of Mr. Stone's gross estate, inter alia, date-of-death values claimed for Mr. Stone's respective partnership interests in ES3LP, ES4LP, CRSLP, RSMLP, and

_____

[52](...continued)
that E&Y's Estate tax allocation schedule reflected as payable by MSFLP in 1998.

[53]The only other distribution reflected in MSFLP's partnership return for 1998 was because of Ms. Stone's death in that year. The partnership return that MSFLP filed for 1998 reflected that MSFLP opened a capital account for Ms. Stone's estate (Ms. Stone's estate's capital account in MSFLP), and the balance in Ms. Stone's capital account as a limited partner was transferred to Ms. Stone's estate's capital account in MSFLP.

Because of Mr. Stone's death in 1997, in that year, as reflected in the partnership return that MSFLP filed for 1997, MSFLP opened capital accounts for his estate (Mr. Stone's estate's capital accounts in MSFLP), and the balances in Mr. Stone's capital accounts in MSFLP as a general partner and a limited partner were transferred to Mr. Stone's estate's capital accounts in MSFLP. The partnership return that MSFLP filed for 1997 showed that MSFLP did not make distributions during that year to any of its other partners.

[54]The $585,239 expense reflected in MSFLP's 1998 financial statements equals the total amount of Federal and State estate taxes with respect to Mr. Stone's estate that E&Y's estate tax allocation schedule reflected as payable by MSFLP in 1998. See supra note 52.

MSFLP and certain other property to be held by the AWS Trust pursuant to Mr. Stone's will. In Mr. Stone's estate tax return, the co-personal representatives[55] of Mr. Stone's estate made a qualified terminable interest property (QTIP) election under section 2056(b)(7) with respect to the AWS Trust. Consequently, although the claimed respective date-of-death values of Mr. Stone's partnership interests in ES3LP and certain other property to be held by that trust were reported in Mr. Stone's estate tax return as part of Mr. Stone's estate, Mr. Stone's estate claimed a deduction in that return under section 2056(a) for such respective values of such partnership interests and such certain other property. Mr. Stone's estate tax return showed net estate tax of $4,031,260, prior payments of $1,698,074, and a balance due of $2,333,186.

On March 10, 1999, the IRS received $2,524,858.57 (March 10, 1999 payment) in payment of the estate tax shown due (i.e., $2,333,186) in Mr. Stone's estate tax return and interest.[56] Of that total amount of estate tax and interest paid in 1999, ES4LP paid $371,336.72, CRSLP paid $1,000,641.91, RSMLP paid $571,597.34, and MSFLP paid $514,194.67. In 1999, State estate

_____

[55]All of the children are co-personal representatives of Mr. Stone's estate.

[56]The March 10, 1999 payment included interest because Mr. Stone's estate applied for and received an extension of time within which to pay the balance of the estate tax due with respect to Mr. Stone's estate.

tax and interest totaling $655,594 were paid with respect to Mr. Stone's estate.  Of that total amount of State estate tax and interest paid in 1999, ES4LP paid $98,545, CRSLP paid $268,474, RSMLP paid $151,871, and MSFLP paid $136,704.  The funds used to pay Federal and State estate taxes and interest in 1999 with respect to Mr. Stone's estate consisted of non pro rata distributions to or on behalf of his estate.

The partnership return that ES4LP filed for 1999 reflected that ES4LP made distributions during that year to its partners totaling $529,254, as follows:  $469,882 to Mr. Stone's estate,[57] $47,749 to Ms. Stone's estate, $11,602 to Eugene Earle Stone, IV, and $21 to Anne M. Stone.

ES4LP's balance sheet for 1999 included a schedule entitled "Eugene E. Stone IV Limited Partnership, General Ledger, As of December 31, 1999" (ES4LP's 1999 general ledger).  ES4LP's 1999 general ledger reflected a check dated March 4, 1999, payable to Eugene E. Stone, III, in the amount of $469,881.72.[58]  Another schedule (capital accounts schedule) included as part of ES4LP's

---

[57]The $469,882 distribution to Mr. Stone's estate shown in ES4LP's 1999 partnership return equals the total amount of Federal and State estate taxes and interest with respect to Mr. Stone's estate that E&Y's Estate tax allocation schedule reflected as payable by ES4LP in 1999.

[58]The $469,881.72 check reflected in ES4LP's 1999 general ledger and rounded to $469,882 equals the total amount of Federal and State estate taxes and interest with respect to Mr. Stone's estate that E&Y's estate allocation schedule reflected as payable by ES4LP in 1999.  See supra note 57.

balance sheet for 1999 showed, inter alia, the capital accounts of the partners of ES4LP.  The capital accounts schedule reflected cash distributions during 1998 and 1999 from ES4LP to Mr. Stone's estate of $629,671[59] and $469,882, respectively.  That schedule also reflected negative adjustments to the respective capital accounts of the remaining partners of ES4LP in such amounts that all of the partners of ES4LP were shown to have received pro rata partnership distributions during 1998 and 1999. The capital accounts schedule reclassified such negative adjustments as loans made to ES4LP from all of its partners, except Mr. Stone's estate.

The partnership return that CRSLP filed for 1999 reflected that CRSLP did not make distributions during that year to any of its partners.  Schedule L, Balance Sheets per Books, of the partnership return that CRSLP filed for 1999 reflected a yearend asset of $1,369,116 identified as "Other investments".  A statement attached to that return explained that such "Other investments" was an amount of $1,369,116 "Due From C. Rivers Stone".

CRSLP's trial balance worksheets for 1999 reflected the following entries:

[59]As a result of bookkeeping entries, the $639,288 non pro rata distribution during 1998 from ES4LP to Mr. Stone's estate that was reflected in ES4LP's 1998 partnership return was reflected in the capital accounts schedule as a distribution to that estate of $629,671.

| Description | Prior Year Balance | Current Year Balance | Adjustments | Adjusted Balance |
|---|---|---|---|---|
| C.R. Stone-Estate Taxes | $100,000 | $100,000 | [1]$1,269,115.91 | $1,369,115.91 |

[1]The $1,269,115.91 expenditure reflected in CRSLP's 1999 Montebello expense schedule with respect to Mr. Stone's estate equals the amounts of Federal and State estate taxes and interest with respect to Mr. Stone's estate that E&Y's Estate tax allocation schedule reflected as payable by CRSLP in 1999.

A schedule entitled "C. Rivers Stone LLP '99, Montebello Actual Expenses (1/20/00)" (CRSLP's 1999 Montebello expense schedule) reflected in pertinent part the following entries:

| Vendor | C/F | March 1999 | 1999 Totals | Grand Totals |
|---|---|---|---|---|
| Estate Taxes | $100,000 | $1,269,115.91 | $1,269,115.91 | $1,369,115.91 |
| First Trust-Est. Tax Loan | 0 | [1] | 534,980.73 | 534,980.73 |
| South Trust-Estate Tax Loan | 0 | [2] | 14,837.39 | 14,837.39 |

[1]The 1999 Montebello expense schedule reflected various entries on the line entitled "First Trust-Est. Tax Loan" for each of the months February through December 1999. Those entries, when totaled, equaled the "1999 Totals" reflected on that line.
[2]The 1999 Montebello expense schedule reflected various entries on the line entitled "South Trust-Estate Tax Loan" for each of the months April through July 1999. Those entries, when totaled, equaled the "1999 Totals" reflected on that line.

The partnership return that RSMLP filed for 1999 reflected that RSMLP made distributions during that year to Mr. Stone's estate of $1,041,871[60] and did not make distributions during that year to any of its other partners.

---

[60]The $1,041,871 distribution to Mr. Stone's estate shown in RSMLP's 1999 partnership return exceeds the total amount of Federal and State estate taxes and interest with respect to Mr. Stone's estate (i.e., $723,468.34) that E&Y's Estate tax allocation schedule reflected as payable by RSMLP in 1999.

The partnership return that MSFLP filed for 1999 reflected that MSFLP made distributions during that year to Mr. Stone's estate totaling $805,693[61] and did not make distributions during that year to any of its other partners.

A 1999 profit and loss statement for MSFLP (MSFLP's 1999 profit and loss statement) reflected an expense of $805,692.67[62] for "Tax: Fed".

On October 16, 1998, Ms. Stone died at the age of 86. Pursuant to Mr. Stone's will, upon the death of Ms. Stone, any assets remaining in the AWS Trust were to be distributed equally to the children.

On the date of Ms. Stone's death, the AWS Trust held a 69.973 percent limited partnership interest in ES3LP,[63] the assets

---

[61]The $805,693 distribution to Mr. Stone's estate shown in MSFLP's 1999 partnership return exceeds the total amount of Federal and State estate taxes and interest with respect to Mr. Stone's estate (i.e., $650,899) that E&Y's Estate tax allocation schedule reflected as payable by MSFLP in 1999.

[62]The $805,692.67 expense reflected in MSFLP's 1999 profit and loss statement and rounded to $805,693 exceeds the total amount of Federal and State estate taxes and interest with respect to Mr. Stone's estate (i.e., $650,899) that E&Y's Estate tax allocation schedule reflected as payable by MSFLP in 1999. See supra note 61.

[63]On June 5, 1997, the date of Mr. Stone's death, Mr. Stone held a 1.001 percent general partnership interest and a 68.972 percent limited partnership interest in ES3LP. Both of those interests were transferred to the AWS Trust pursuant to Mr. Stone's will. The parties stipulated that on Oct. 16, 1998, the date of Ms. Stone's death, the AWS Trust held a 69.973 percent limited partnership interest in ES3LP. We presume that after Mr.
(continued...)

on that date in Mr. Stone's retirement account, and the right on that date to Mr. Stone's deferred compensation from Stone Manufacturing. The respective identities and values of the assets owned by ES3LP on the date of Mr. Stone's death on June 5, 1997, were not the same as the respective identities and values of the assets owned by that partnership on the date of Ms. Stone's death on October 16, 1998. Moreover, the respective identities and values of the assets in Mr. Stone's retirement account on the date of Mr. Stone's death on June 5, 1997, were not the same as the respective identities and values of the assets in that retirement account on the date of Ms. Stone's death on October 16, 1998. In addition, the present value on the date of Ms. Stone's death of Mr. Stone's right to deferred compensation from Stone Manufacturing was less than the present value of his right to such compensation on the date of his death.

On July 20, 1999, the IRS received $875,000 (July 20, 1999 payment) in payment of the anticipated estate tax with respect to Ms. Stone's estate.

On January 20, 2000, Ms. Stone's estate filed an estate tax return (Ms. Stone's estate tax return). Pursuant to section 2044, Ms. Stone's estate tax return reported as part of the value

---

[63](...continued)
Stone's death Mr. Stone's general partnership interest in ES3LP was converted pursuant to the partnership agreement of ES3LP into a limited partnership interest.

of her gross estate the date-of-death values claimed for all the assets held by the AWS Trust as of October 16, 1998, the date of Ms. Stone's death (i.e., the claimed fair market value on that date of the 69.973 limited partnership interest in ES3LP, the claimed fair market value on that date of all the assets in Mr. Stone's retirement account on that date, and the claimed present value on that date of the deferred compensation from Stone Manufacturing that remained to be paid as of that date).

Ms. Stone's estate tax return also reported as part of the value of her gross estate the claimed value as of the date of Ms. Stone's death of her limited partnership interest in each of the Five Partnerships.[64]  Ms. Stone's estate tax return showed net

---

[64]E&Y was retained to provide opinions on the fair market value on the date of Ms. Stone's death of her limited partnership interest in each of ES4LP, CRSLP, RSMLP, and MSFLP.  E&Y based those opinions on, inter alia, the assumptions that, as of the date of Ms. Stone's death, ES4LP, CRSLP, RSMLP, and MSFLP had the following respective liabilities for "an estate tax payable" with respect to Mr. Stone's estate:

| Partnership | Erroneous Assumptions Relied on by E&Y Regarding Estate Tax Liability |
|---|---|
| ES4LP | $469,882 |
| CRSLP | 1,269,116 |
| RSMLP | 723,468 |
| MSFLP | 650,899 |

The parties agree that neither the Federal estate tax nor the State estate tax with respect to Mr. Stone's estate was a liability of ES4LP, CRSLP, RSMLP, or MSFLP and that, as of Oct. 16, 1998, ES4LP, CRSLP, RSMLP, and MSFLP had the following total liabilities:

(continued...)

estate tax of $861,972, a prior payment of $875,000, and an overpayment of $13,028.

Respondent commenced examinations of Mr. Stone's estate tax return and Ms. Stone's estate tax return after July 22, 1998. Mr. Stone's estate and Ms. Stone's estate cooperated with reasonable requests by respondent for witnesses, information, documents, meetings, and interviews.

On September 7, 2001, respondent issued a notice of deficiency (notice) to Mr. Stone's estate. In that notice, respondent determined, inter alia, to increase by $8,491,090 the value attributable to Mr. Stone's respective partnership interests in ES3LP, ES4LP, CRSLP, RSMLP, and MSFLP reported in SCHEDULE F, Other Miscellaneous Property Not Reportable Under Any Other Schedule (Schedule F), of Mr. Stone's estate tax return. In support of that determination, respondent relied on seven alternative grounds, including the substance over form doctrine, the economic substance doctrine, section 2036(a)(1) which was respon-

---

[64](...continued)

| Partnership | Total Liabilities |
|---|---|
| ES4LP | $0 |
| CRSLP | 2,428,389 |
| RSMLP | 0 |
| MSFLP | 0 |

dent's third alternative ground, and respondent's gift theory.[65]
With respect to respondent's alternative ground under section
2036(a)(1), respondent determined in the notice that

> the decedent retained until the time of his death the
> possession or enjoyment * * * [of], or right to the
> income from, the assets he contributed to the * * *
> [Five Partnerships] within the meaning of Internal
> Revenue Code Section 2036. * * *

On November 13, 2001, respondent issued a notice to Ms.
Stone's estate.  In that notice, respondent determined to in-
crease (1) by $688,385 the value attributable to Ms. Stone's
respective partnership interests in ES3LP, ES4LP, CRSLP, RSMLP,
and MSFLP and (2) by $959,463 the value attributable to the
partnership interest in ES3LP held by the AWS Trust, which were
reported in Schedule F of Ms. Stone's estate tax return.  In
support of those determinations, respondent relied on six alter-
native grounds, including the substance over form doctrine, the
economic substance doctrine, and section 2036(a)(1) which was
respondent's third alternative ground.  With respect to respon-

---

[65]With respect to respondent's alternative gift theory,
respondent determined in the notice that

> if it is determined that the value of the decedent's
> [Mr. Stone's] interests is other than that as deter-
> mined above, then, for purposes of determining the
> amount of adjusted taxable gifts, it is determined that
> the decedent made indirect gifts in 1997 of proportion-
> ate amounts of the property the decedent transferred to
> * * * [ES3LP, ES4LP, CRSLP, MSFLP, and RSMLP] within
> the meaning of Internal Revenue Code Sections 2501 and
> 2511.

dent's alternative ground under section 2036(a)(1), respondent

determined in the notice that

> the decedent retained until the time of her death the
> possession or enjoyment of, or right to the income
> from, the assets he [sic] contributed to the * * *
> [Five Partnerships] within the meaning of Internal
> Revenue Code Section 2036. * * *

OPINION

Respondent has abandoned all of the various alternative

determinations in the respective notices issued to Mr. Stone's

estate and Ms. Stone's estate (collectively, the estates) except

section 2036(a)(1).[66]  According to respondent,

> The only issue remaining for decision is whether sec-
> tion 2036(a)(1) applies to include the value of the
> assets Decedents [Mr. Stone and Ms. Stone] transferred
> to the Stone LPs [ES3LP, ES4LP, CRSLP, RSMLP, and
> MSFLP], rather than of interests in the partnerships,
> in their gross estates.

However, as discussed below, on brief respondent also relies on

section 2044 at the time of Ms. Stone's death, and section

2036(a)(1) at the time of Mr. Stone's death, in support of re-

spondent's position that "the pro rata net asset value of the

---

[66]With respect to the alternative economic substance doc-
trine that respondent advanced in the respective notices issued
to Mr. Stone's estate and Ms. Stone's estate, respondent stipu-
lated as follows:

> Respondent does not contest the validity under
> state law of * * * ES3LP * * * ES4LP * * * CRSLP * * *
> RSMLP * * * and * * * MSFLP * * *.

> Respondent does not contest the economic substance
> of ES3LP, ES4LP, CRSLP, RSMLP, and MSFLP.

69.973% interest in ES3LP held by the AWS Trust at her [Ms.
Stone's] death is * * * included in Mrs. Stone's gross estate."

In addition to the foregoing substantive disputes regarding
sections 2036(a)(1) and 2044, the parties disagree over whether
the burden of proof has shifted to respondent under section
7491(a). The parties' disagreements under section 7491(a) relate
to the application in the instant cases of the term "credible
evidence" in section 7491(a)(1) and the factual issue or issues
with respect to which Mr. Stone's estate and Ms. Stone's estate
must introduce credible evidence in order for the burden of proof
regarding any such issue or issues to shift to respondent. We
need not and shall not address those disagreements under section
7491(a)(1). That is because resolution of the issues presented
under sections 2036(a)(1) and 2044 does not depend on who has the
burden of proof.

Section 2036(a)(1)

In order to resolve the parties' dispute under section
2036(a)(1),[67] we must consider the following three factual issues

---

[67]Sec. 2036(a)(1) provides:

SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.

    (a)  General Rule.--The value of the gross estate
shall include the value of all property to the extent
of any interest therein of which the decedent has at
any time made a transfer (except in case of a bona fide
sale for an adequate and full consideration in money or
money's worth), by trust or otherwise, under which he
                                          (continued...)

presented in each of the instant cases:

(1)  Was there a transfer of property by the decedent?

(2)  If there was a transfer of property by the decedent, was such a transfer other than a bona fide sale for an adequate and full consideration in money or money's worth?

(3)  If there was a transfer of property by the decedent that was other than a bona fide sale for an adequate and full consideration in money or money's worth, did the decedent retain possession or enjoyment of, or the right to income from, the property transferred?

Transfer of Property by the Decedent

Mr. Stone's estate concedes that Mr. Stone made a transfer of property to each of the Five Partnerships in exchange for the general and limited partnership interests in each such partnership that he owned on the date of his death.  Ms. Stone's estate concedes that Ms. Stone made a transfer of property to each of the Five Partnerships in exchange for the limited partnership

---

[67](...continued)
has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1)  the possession or enjoyment of, or the right to the income from, the property * * *

interest in each such partnership that she owned on the date of her death. In light of the foregoing concessions by Mr. Stone's estate and by Ms. Stone's estate, we hold that Mr. Stone and Ms. Stone each made a transfer of property under section 2036(a). We shall address below whether such respective transfers were other than bona fide sales for adequate and full consideration in money or money's worth under that section.

Ms. Stone's estate disputes, and does not concede, that Ms. Stone made a transfer of property to ES3LP in exchange for the 69.973 percent partnership interest in that partnership that the AWS Trust held on the date of her death. Respondent agrees with Ms. Stone's estate.[68] In light of respondent's concession, we hold that Ms. Stone did not make a transfer of property under section 2036(a) with respect to the 69.973 percent partnership interest in ES3LP that the AWS Trust held on the date of her death.[69]

_____

[68]According to respondent, "it is irrelevant that Mrs. Stone made no § 2036(a) transfer with respect to that [69.973 percent] interest [in ES3LP]." That is because, as indicated above, respondent relies on sec. 2044 at the time of Ms. Stone's death, and sec. 2036(a)(1) at the time of Mr. Stone's death, to support respondent's position that 69.973 percent of the assets of ES3LP on the date of Ms. Stone's death is includible in her gross estate.

[69]We shall address below respondent's argument under sec. 2044.

Transfer Other Than a Bona Fide Sale for an
Adequate and Full Consideration in Money or Money's Worth

Section 2036(a) excepts from its application any transfer of property otherwise subject to that section which is "a bona fide sale for an adequate and full consideration in money or money's worth".  The foregoing exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction".  Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).

It is respondent's position that the respective transfers of property by Mr. Stone and Ms. Stone to each of the Five Partnerships were not bona fide sales for adequate and full consideration in money or money's worth under section 2036(a).  In support of that position, respondent relies principally on Estate of Harper v. Commissioner, T.C. Memo. 2002-121.[70]  According to respondent, there is no evidence

> in the record indicating that Decedents intended to conduct a joint enterprise for the mutual profit of their children and themselves * * *.
>
>     Further, a transfer is a sale for adequate and full consideration only if that received in exchange is "an adequate and full equivalent reducible to a money value."  Treas. Reg. § 20.2036-1(a) (cross-referencing Treas. Reg. § 20.2043-1(a)).  The average 43-percent valuation discounts claimed on Decedents' estate tax returns, and the stipulated discounts to be applied in

---

[70]Respondent also relies on Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000), and Estate of Thompson v. Commissioner, T.C. Memo. 2002-246, which are factually similar to Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

valuing Decedents' limited partner interests in the event the Court concludes that section 2036(a)(1) is not applicable, show that Petitioners admittedly do not consider interests in the Stone LPs to be the "full equivalent reducible to a money value" of the proportionate amount of the underlying assets Decedents contributed to the partnerships. * * * As in Estate of Harper, Decedents' transfers to the Stone LPs were simply a mere recycling of value and form of ownership. * * *

It is the estates' position that the respective transfers of property by Mr. Stone and Ms. Stone to each of the Five Partnerships were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a). In support of that position, the estates argue:

Because Mr. and Mrs. Stone received pro rata partnership interests in return for the contributions made to the Partnerships * * *, and because the contributions were properly credited to each partner's capital account * * *, there was no donative transfer made in connection with the creation of the Partnerships. * * * Because no donative transfer occurred when the Partnerships were formed § 2036(a) does not apply. * * *

        *       *       *       *       *       *       *

In Harper, the Court's finding of no bona fide sale for adequate and full consideration was based upon the conclusion that the creation of the partnerships was not "motivated primarily by legitimate business concerns," and constituted only "unilateral" value recycling. * * * In [Estate of] Thompson [v. Commissioner, T.C. Memo. 2002-46], the Court's finding was based on its conclusion that "the transactions were not motivated by the type of legitimate business concerns that furnished 'adequate consideration' as described in Estate of Harrison v. Commissioner [T.C. Memo. 1987-8] and Estate of Michelson v. Commissioner [T.C. Memo. 1978-371]." * * * In these [instant] cases, however, the creation of the [Five] Partnerships was motivated by substantial business purposes and their creation and funding resulted from substantial arm's-length negotia-

tions. * * * The creation of the [Five] Partnerships did not constitute "value recycling," and Mr. and Mrs. Stone received full and adequate consideration for their transfers to the partnerships. [Fn. ref. omitted.]

On the record before us, we agree with the estates' position and reject respondent's position. The instant cases are distinguishable from Estate of Harper v. Commissioner, supra, and other cases factually similar to Estate of Harper[71] on which respondent relies, and respondent's reliance on such cases is misplaced. Unlike the transfers involved in Estate of Harper and those other cases, we have found on the record in the instant cases that the respective transfers of assets by Mr. Stone and Ms. Stone to each of the Five Partnerships, as well as the respective transfers of assets by the other partners to each such partnership,[72] were bona

---

[71]See supra note 70.

[72]All the partners of each of the Five Partnerships transferred to each such partnership respective assets such partners owned. We reject respondent's contention that, because certain of the assets that the children respectively transferred to one or more of the Five Partnerships were assets that they received as gifts from Mr. Stone, the children did not make transfers to one or more of such partnerships that should be recognized for purposes of determining the applicability of sec. 2036(a)(1) to such transfers. Mr. Stone gave certain property to each of the children, which they then transferred to one or more of the Five Partnerships in return for partnership interests. Mr. Stone reported the gifts that he made to the children in his 1997 gift tax return. The children owned the assets that he gave them when they respectively transferred such assets to one or more of such partnerships. In this connection, we note that respondent abandoned the alternative substance over form doctrine advanced in the respective notices issued to Mr. Stone's estate and Ms. Stone's estate.

fide, arm's-length transfers.

On the record before us, we reject respondent's contention that, because Mr. Stone and Ms. Stone did not actively participate in the negotiations by the children, the respective transfers of assets by Mr. Stone and Ms. Stone to each of the Five Partnerships were not bona fide, arm's-length transfers. Each member of the Stone family was represented by his or her own independent counsel and had input into the decision-making as to how each of the Five Partnerships was to be structured and operated and what property was to be transferred to each such partnership. The Stone family understood that Mr. Stone and Ms. Stone would not be bound by any agreements that the children were able to reach as a result of the children's negotiations and that Mr. Stone and Ms. Stone would make the ultimate decision as to which, if any, of their respective assets to transfer to each of the Five Partnerships. In this connection, although Mr. Stone and Ms. Stone agreed to form the Five Partnerships, they did not intend to, and did not, transfer all their respective assets to such partnerships. Instead, they retained sufficient assets to enable them to maintain their respective accustomed standards of living. Mr. Stone and Ms. Stone did not accept the children's recommendations resulting from the children's negotiations regarding the structure, funding, and operation of the Five Partnerships without thought, comment, or question. For example, it

was Mr. Merline, Mr. Stone's attorney, who drafted proposed partnership agreements for the Five Partnerships. Mr. Merline discussed with Mr. Stone the children's and their respective attorneys' suggested changes to those proposed agreements. Only after Mr. Stone agreed to certain of those suggested changes did Mr. Merline revise the proposed partnerships agreements to reflect the changes to which Mr. Stone agreed.

The record also establishes that the respective transfers at issue did not constitute gifts by Mr. Stone and Ms. Stone, respectively, to the other partners of each of the Five Partnerships.[73] In addition, the record shows that those transfers were motivated primarily by investment and business concerns relating to the management of certain of the respective assets of Mr. Stone and Ms. Stone during their lives[74] and thereafter and the resolution of the litigation among the children.

_____

[73]Respondent properly does not contend that the respective transfers of assets by Mr. Stone and Ms. Stone to each of the Five Partnerships were gifts by them to the other partners of each such partnership. See Estate of Jones v. Commissioner, 116 T.C. 121, 127-128 (2001); Estate of Michelson v. Commission, T.C. Memo. 1978-371. In this connection, respondent asserted in the notice issued to Mr. Stone's estate an alternative gift theory which respondent has since abandoned. Respondent did not assert any alternative gift theory in the notice issued to Ms. Stone's estate.

[74]At least as early as the last six months of 1995, Mr. Stone and Ms. Stone were in control of their respective assets. However, they no longer were interested or actively involved in managing those assets and wanted their children to become actively involved in the management of those assets.

Unlike the decedent in Estate of Harper and other cases factually similar to that case, the record in the instant cases establishes that Mr. Stone and Ms. Stone did substantially more than "change the form in which he [and she] held his [and her] beneficial interest in the contributed property." Estate of Harper v. Commissioner, T.C. Memo. 2002-121. The record in the instant cases shows that the Five Partnerships had economic substance and operated as joint enterprises for profit through which the children actively participated in the management and development of the respective assets of such partnerships during their parents' lives (and thereafter). When the partners of ES3LP formed and funded that partnership, they contemplated and intended that ES3LP operate as a joint enterprise for profit for the management of its assets and that the children contribute their services in providing such management. After ES3LP was funded in April 1997, the children actively managed the assets of that partnership, as Mr. Stone and Ms. Stone intended. When the partners of ES4LP formed and funded that partnership, they contemplated and intended that ES4LP operate as a joint enterprise for profit for the management of its assets and that Eugene Earle Stone, IV, contribute his services in providing such management. After the funding of ES4LP in April 1997, Eugene Earle Stone, IV, began actively managing the assets of ES4LP, as Mr. Stone and Ms. Stone intended. When the partners of CRSLP formed and funded

that partnership, they contemplated and intended that CRSLP operate as a joint enterprise for profit for the management of its assets and that C. Rivers Stone contribute his services in providing such management.  After the funding of CRSLP in April 1997, C. Rivers Stone began actively managing the assets of that partnership, as Mr. Stone and Ms. Stone intended.  When the partners of RSMLP formed and funded that partnership, they con-templated and intended that RSMLP operate as a joint enterprise for profit for the management of its assets and that Ms. Morris contribute her services in providing such management.  After the funding of RSMLP in April 1997, Ms. Morris began actively manag-ing the assets of that partnership, as Mr. Stone and Ms. Stone intended.  When the partners of MSFLP formed and funded that partnership, they contemplated and intended that MSFLP operate as a joint enterprise for profit for the management of its assets and that Ms. Fraser contribute her services in providing such management.  After the funding of MSFLP in April 1997, Ms. Fraser began actively managing the assets of that partnership, as Mr. Stone and Ms. Stone intended.

On the record in the instant cases, we find that, unlike the transfers involved in Estate of Harper and other cases factually similar to that case, the respective transfers at issue by Mr. Stone and Ms. Stone did not constitute "circuitous 'recycling' of

value".[75]

On the record before us, we further find that the respective transfers of assets by Mr. Stone and Ms. Stone to each of the Five Partnerships were for adequate and full consideration in money or money's worth. We have found that such transfers were not, and respondent does not claim that they were, gifts by Mr. Stone and Ms. Stone, respectively, to the other partners of each such partnership. We have also found, and respondent agrees and/or does not dispute, that after all the partners of each of the Five Partnerships transferred to each such partnership certain of their respective assets and after certain gifts were made by Mr. Stone in April 1997 to correct the unintended consequences of certain inadvertent valuation errors:[76] (1) All partners of

---

[75]Although not cited by the parties in the instant cases because they filed their respective briefs prior to the issuance of Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, Strangi insofar as it relates to sec. 2036(a)(1) is similar to Estate of Harper v. Commissioner, T.C. Memo. 2002-121, and is distinguishable from the instant cases. On the facts presented, Strangi found, as Estate of Harper did on the facts presented there, that "there has been merely a 'recycling' of value through partnership or corporate solution." Estate of Strangi v. Commissioner, supra. In so concluding, Strangi found that the arrangement involved in that case "patently fails to qualify as the sort of functioning business enterprise that could potentially inject intangibles that would lift the situation beyond mere recycling." Id.

[76]Respondent properly does not contend that Mr. Stone's gifts to correct the unintended consequences of certain inadvertent valuation errors are factors to be considered in determining whether the transfers at issue were bona fide sales for adequate and full consideration in money or money's worth under sec.

(continued...)

each of the Five Partnerships held respective partnership inter-
ests in each such partnership that were proportionate to the fair
market value of the assets that such partners respectively trans-
ferred to each such partnership; (2) the respective assets that
the partners of each such partnership transferred to each such
partnership were properly credited to the respective capital
accounts of such partners; and (3) upon the termination or disso-
lution of each of the Five Partnerships, the partners of each
such partnership were entitled to distributions from each such
partnership in amounts equal to their respective capital ac-
counts.  Under the circumstances presented in the instant cases,
we find that Mr. Stone and Ms. Stone, as well as the other part-
ners of each of the Five Partnerships, received in exchange for
their respective transfers of assets to each such partnership
respective partnership interests in each such partnership that
were adequate and full equivalents reducible to a money value.
See secs. 20.2036-1(a), 20.2043-1(a), Estate Tax Regs.; see also
Estate of Goetchius, 17 T.C. at 503.

Respondent nonetheless argues that, because Mr. Stone and
Ms. Stone received respective partnership interests in each of
the Five Partnerships the value of which, taking into account
appropriate discounts, was less than the value of the respective

---

[76](...continued)
2036(a).

assets that they transferred to each such partnership, they did not receive adequate and full consideration for the assets transferred. Respondent's argument in effect reads out of section 2036(a) the exception for "a bona fide sale for an adequate and full consideration in money or money's worth" in any case where there is a bona fide, arm's-length transfer of property to a business entity (e.g., a partnership or a corporation) for which the transferor receives an interest in such entity (e.g., a partnership interest or stock) that is proportionate to the fair market value of the property transferred to such entity and the determination of the value of such an interest takes into account appropriate discounts. We reject such an argument by respondent that reads out of section 2036(a) the exception that Congress expressly prescribed when it enacted that statute.

Respondent's argument about the discounted values of the partnership interests at issue also ignores the fact that each of the Five Partnerships was created, funded, and operated as a joint enterprise for profit for the management of its assets in which there was a genuine pooling of property and services. We have found that, when the partners of each of the Five Partnerships formed and funded each such partnership, they contemplated and intended that each such partnership operate as a joint enterprise for profit for the management of its assets and that the children contribute services in providing such management in the

case of ES3LP and that Eugene Earle Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser contribute services in providing such management in the case of ES4LP, CRSLP, RSMLP, and MSFLP, respectively. As Mr. Stone and Ms. Stone intended, after the funding of ES3LP, the children actively participated in the management of the assets of that partnership, and after the funding of ES4LP, CRSLP, RSMLP, and MSFLP, Eugene Earle Stone, IV, C. Rivers Stone, Ms. Morris, and Ms. Fraser, respectively, actively participated in the management of the assets of such partnerships.

Based upon our examination of the entire record before us, we find that the respective transfers of assets by Mr. Stone and Ms. Stone to each of the Five Partnerships were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a).[77]

> Possession or Enjoyment of, or
> Right to Income from, the Transferred Property

We have found that the respective transfers of assets by Mr.

---

[77]Although not altogether clear, respondent appears to take the position that, where a decedent has made a bona fide transfer of property for which the decedent has received an adequate and full consideration in money or money's worth and with respect to which the transferor has retained possession or enjoyment of, or the right to income from, such property, the exception in sec. 2036(a) for "a bona fide sale for an adequate and full consideration in money or money's worth" may never apply to such a transfer. We reject any such position. That position, like respondent's position about the discounted values of the partnership interests at issue, in effect reads out of sec. 2036(a) the exception that Congress expressly prescribed when it enacted that statute.

Stone and Ms. Stone to each of the Five Partnerships were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a). Consequently, we need not and shall not address the third factual issue presented under section 2036(a)(1).

Ultimate Holdings

Based upon our examination of the entire record before us, we hold that none of the assets owned by any of the Five Partnerships (1) on the date of Mr. Stone's death is includible under section 2036(a)(1) in his gross estate and (2) on the date of Ms. Stone's death is includible under section 2036(a)(1) in her gross estate.

Section 2044

Respondent argues that, because section 2036(a)(1) requires the inclusion in Mr. Stone's gross estate of 69.973 percent of the assets of ES3LP on the date of his death, section 2044 requires the inclusion in Ms. Stone's gross estate of 69.973 percent of the assets of ES3LP on the date of her death.[78] We have rejected respondent's position that section 2036(a)(1) requires the inclusion in Mr. Stone's gross estate of 69.973 percent of

---

[78]Respondent did not raise sec. 2044 in the notice issued to Ms. Stone's estate or in the answer. We conclude that respondent's reliance on sec. 2044 raises a new issue that respondent advances for the first time on brief. However, the estates do not object to, and we find no prejudice to the estates as a result of, respondent's raising that issue for the first time on brief.

the assets of ES3LP on the date of his death.  Consequently, we need not and shall not address the argument that respondent advances under section 2044.  On the record before us, we hold that none of the assets owned by ES3LP on the date of Ms. Stone's death is includible under section 2044 in her gross estate.

We have considered all of the respective contentions and arguments of the estates and of respondent that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.